725 So.2d 441 (1999)
STATE of Florida, Appellant,
v.
Joe Nathan BROWN, Appellee.
No. 97-2502
District Court of Appeal of Florida, Fifth District.
February 5, 1999.
*442 Robert A. Butterworth, Attorney General, Tallahassee, and Mary G. Jolley, Assistant Attorney General, Daytona Beach, for Appellant.
James B. Gibson, Public Defender, and Brynn Newton, Assistant Public Defender, Daytona Beach, for Appellee.
W. SHARP, J.
The state appeals from the trial court's order, which suppressed Brown's blood alcohol test results[1] in his DUI manslaughter trial.[2]
The trial judge ruled that the police officer who ordered the blood test (Trooper Campbell), lacked probable cause to believe Brown was under the influence of alcoholic beverages at the time of the fatal collision between Brown's car and a bicyclist and thus Brown's blood was not properly taken and tested pursuant to section 316.1933(1). We reverse.
The suppression ruling came at an unusual time during this criminal prosecution, but we do not find that, by itself, is a basis to invalidate it. The motion to suppress was filed two days before the trial began. As the trial was commencing, the defense asked the court to rule on its suppression motion. The trial court observed the motion had been filed late, but went forth with picking the jury. The following day the judge heard the attorney's legal arguments and summaries of what the witnesses would testify about at trial, based on their depositions. He concluded the blood test results would be admitted, and the jury trial began.
During the state's opening statement, counsel said Brown's alcohol test would be placed in evidence and that it showed a level of .12. After hearing the testimony of three state witnesses, the trial judge began to question his ruling on the suppression motion. He excluded the jury and asked the state to proffer Trooper Campbell's testimony.
Campbell testified and was cross-examined by the defense. The court also asked him questions. It then ruled the blood test should be excluded. Because the test had been mentioned in the state's opening statement, the court gave Brown's defense counsel the option of proceeding with the trial with no further mention of the blood test, or granting the defense counsel's motion for a mistrial. The defense expressly waived double jeopardy should the ruling be appealed and overturned. The court declared a mistrial.
The trial judge made the following findings in its order:
There was no factual basis discernable from the circumstances of the accident or the Defendant's operation of his vehicle prior to the accident upon which a reasonable person could conclude the Defendant was under the influence of an alcoholic beverage at the time of the accident; ..and in addition [the motion is granted] for the reasons and conclusions previously stated in the record.
A copy of part of the trial transcript was attached, which contained the court's findings.
The judge stated he thought there were insufficient facts and circumstances known and available to Trooper Campbell to establish probable cause for him to reasonably conclude Brown was under the influence of alcohol at the time of the accident. He summarized the testimony as follows:
*443 Brown was driving carefully and slowly when he hit a bicyclist traveling in his lane, on a dark night; the bicyclist was wearing dark clothing and his bicycle had no lights or reflectors; the odor of alcohol was detected on Brown's breath; there was a strong odor of alcohol in Brown's car; Brown was not given a roadside sobriety test; Brown admitted to Trooper Campbell he had consumed at least two beers; Brown appeared to be very emotionally upset by the accident; and Trooper Campbell, after ordering the blood test some three to four hours after the accident, did not arrest Brown for DUI, but allowed him to drive away.
At the close of the suppression hearing, the trial judge incorrectly said the Trooper testified he did not see that Brown had blood shot eyes. However, based on the trial transcript, the Trooper actually said: "... his eyes were blood shot."
The trial judge felt there had been little more than the odor of alcohol to establish Brown's impairment plus Brown's admission that he had consumed two beers. That, he felt, was not enough to show Brown was "under the influence" of alcohol.
Further, the trial judge was concerned and troubled by Trooper Campbell's testimony that although he thought he had probable cause to order the blood draw pursuant to section 316.1933(1), he did not think he had probable cause to arrest Brown for DUI. The trooper explained by saying that the case was a "border line" one for a DUI arrest, and if he had simply stopped Brown along the highway, he probably would not have arrested him.
Trooper Campbell also testified he was in doubt about arresting Brown at the accident scene and had telephoned the state attorney's office for advice. He was advised to follow "policy" and await the results of the blood test. He could then make an arrest for DUI.
Section 316.1933(1) provides in pertinent part:
[I]f a law enforcement officer has probable cause to believe that a motor vehicle driven by or in the actual physical control of a person under the influence of alcoholic beverages ... has caused the death or serious bodily injury of a human being, such person shall submit, upon the request of a law enforcement officer, to a test of the person's blood for the purpose of determining the alcoholic content thereof....
The statute does not define what is meant by "under the influence of alcoholic beverages," nor does it go on and say, as does section 316.193 to the extent that the person's "normal faculties are impaired."
We agree with the trial judge in this case that "under the influence" means something more than just having consumed an alcoholic beverage. But it also can mean something less than intoxicated. Rodriguez v. State, 694 So.2d 96 (Fla. 3d DCA 1997); Jackson v. State, 456 So.2d 916 (Fla. 1st DCA 1984). "Though all persons intoxicated by the use of alcoholic liquors are under the influence of intoxicating liquors, the reverse of the proposition is not true, for a person may be under the influence of intoxicating liquors without being intoxicated." Cannon v. State, 91 Fla. 214, 107 So. 360, 362 (1926).
Black's Law Dictionary explains:
"Under the influence"... as used by statutes or ordinances, ... covers not only all well-known and easily recognized conditions and degrees of intoxication, but any abnormal mental or physical condition which is the result of indulging in any degree in intoxicating liquors, and which tends to deprive one of that clearness of intellect and control of himself which he would otherwise possess. Any condition where intoxicating liquor has so far affected the nervous system, brain or muscles of the driver so as to impair, to an applicable degree, his ability to operate his automobile in the manner that an ordinary, prudent and cautious man, in full possession of his faculties, using reasonable care, would operate or drive under like conditions. (emphasis supplied).
Black's Law Dictionary 1369 (5th ed.1979).
We agree with the court in Jackson v. State, 456 So.2d 916 (Fla. 1st DCA 1984) that "under the influence" as used by this statute means the driver's normal faculties were "impaired," *444 not simply that the driver had consumed alcohol.
Whether a person has consumed sufficient alcohol to be deemed "under the influence" or impaired to an appreciable degree pursuant to section 316.1933(1) is a judgment call made by a police officer. It must be based on objective facts and circumstances observed by the officer at the time and place of the accident, and reliable information given to the officer by others. Keeton v. State, 525 So.2d 912 (Fla. 2d DCA), rev. denied, 534 So.2d 400 (Fla.1988); Jackson. Further, Florida courts require that the underlying facts, circumstances and information be sufficient to allow a person of reasonable caution to make the probable cause determination. State v. Cesaretti, 632 So.2d 1105 (Fla. 4th DCA 1994); Dorman v. State, 492 So.2d 1160 (Fla. 1st DCA 1986); Jackson.
The undisputed facts, circumstances and information known to Trooper Campbell (his observations as well as those of three eyewitnesses he interviewed before ordering the blood draw), establish a reasonable basis for him to conclude Brown was at the time of the accident, under the influence of alcohol to such a degree his normal faculties were impaired. Although witness Tucker, the medical assistant who had been following Brown's car in her own, testified Brown was driving carefully below the speed limit, she also said he was slowing down and speeding up in an unusual manner. She and the other two witnesses (Ricky Hartley and his daughter Christine) all saw Brown's car strike the bicyclist. The impact with Brown's car threw the bicyclist's body up on the hood and windshield and onto the shoulder of the road.
All three testified Brown did not immediately stop. He drove on 500-600 yards, braking two or three times before stopping on the shoulder of the road. During this time, Tucker followed the path of the bicyclist's body and located him lying on the shoulder of the road in the grass (but not hidden). She stopped and shined her lights on the body to prevent anyone running over him again while she used her car telephone to call for help.
Ricky Hartley blocked the road with his truck, to prevent traffic from passing him. He shined his lights on the bicycle, which was in the middle of the road. He was in the process of going over to assist the victim when he saw that Brown had begun backing up along the shoulder of the road where the victim was lying.
The Hartleys and Tucker realized Brown was not going to stop. All yelled and waved to warn him, but Brown's rear wheels ran over the bicyclist's body. When Brown realized he had run over something, he put the car in forward gear, and ran over the body again, finally stopping with the body under the trunk of his car.
Brown then got out of his car and rushed over to the victim. He put his arms around the victim and tried to stand him up. He shook him, saying he was going to be "okay." Tucker and Ricky yelled at him to put the victim down. Ricky had to force Brown away from the victim and keep him away.
The victim was still breathing, but unconscious. He was bleeding from a severe head injury and wheezing as he labored to breathe. Airlifted to a hospital, he died some nine hours later. Tucker, Hartley and Trooper Campbell all smelled alcohol on Brown's breath. Tucker said "you could tell he had been drinking." Christine said she saw Brown throwing something onto the floor board of the passenger side of the car. The car smelled strongly of alcohol.
Brown admitted to Trooper Campbell he had been drinking alcohol. Trooper Campbell testified he thought Brown said he had had two beers. Trooper Campbell stated that Brown's eyes appeared to be blood shot, and that he was behaving in a panicky way. Brown appeared upset by the accident.
Trooper Campbell testified that at the time he ordered the blood draw he had probable cause under the statute based on the circumstances of the accident, Brown's behavior after the accident, the odor of alcohol and his admission he had been drinking. Trooper Campbell said the smell of alcohol was the decisive factor, but not the only one in ordering the test.
In our view, based on these objective, uncontroverted facts and circumstances, we *445 think Trooper Campbell had probable cause to order the blood draw, pursuant to section 316.1933(1). The odor of alcohol on a driver's breath is a critical (if not the only)[3] factor in many cases involving admissibility of a blood test under the statute. See State v. Perez, 531 So.2d 961 (Fla.1988); State v. Durden, 655 So.2d 215 (Fla. 1st DCA 1995); Cesaretti; Keeton; Jackson. Another factor present in this case was the observation that Brown had blood shot eyes.[4] Indeed the absence of the odor of alcohol is critical in suppression cases. White v. State, 492 So.2d 1163 (Fla. 1st DCA 1986).
In many cases, the driver's dangerous or reckless driving which preceded and probably caused the accident, is referenced as an objective fact or circumstances which supports a probable cause determination that the driver's normal faculties were impaired. See Johnson (driver had crossed centerline of two-lane highway); Durden (driver had crossed center line of highway); Keeton (driving 65-100 miles per hour in 45 mile per hour zone, in "slow lane"); Jackson (driving at high speed, weaving in and out of traffic lanes).
In this case there was evidence that Brown's behavior was not "normal," and that his rational faculties were impaired. Driving slowly and speeding up and slowing down can also indicate impairment as well as speeding and reckless driving. Brown also did not immediately stop after the accident, as the other drivers did. Further, his behavior in backing up and twice running over the victim's body, in spite of the lights of the other two cars illuminating the accident scene and the witnesses' yelling and waving to stop him, is bizarre behavior and an indicia of impairment.
We are not troubled by Trooper Campbell's testimony that he (subjectively) did not feel he had grounds to arrest Brown for DUI, or that it was "borderline." He may have been mistaken that there is a difference between the two probable cause determinations and we think that he was. However, a police officer's subjective feelings are not the proper criteria. See Jackson; Dorman.
Blood tests have been held admissible even if the police officer testified he or she did not have probable cause to order the blood draw, or that he or she had no opinion on that question. See State v. Silver, 498 So.2d 580 (Fla. 4th DCA 1986), rev. denied, 506 So.2d 1043 (Fla.1987); Jackson. However, Trooper Campbell testified he thought he had probable cause to order the blood draw.
The objective facts and circumstances concerning the accident and the driver's behavior are the controlling criteria to look at in these cases. We think they were sufficient in this case to establish probable cause for the blood draw. We hold that the results of Brown's blood test is and should have been admissible at trial under section 316.1933(1).
REVERSED.
GOSHORN and PETERSON, JJ., concur.
NOTES
[1] Fla. R.App. P. 9.140(c)(1)(B).
[2] §§ 316.193(1), 361.193(a), (b), (c)3, Fla. Stat. (1995).
[3] Cesaretti; State v. Silver, 498 So.2d 580 (Fla. 4th DCA 1986), rev. denied, 506 So.2d 1043 (Fla. 1987).
[4] See State v. Johnson, 695 So.2d 771 (Fla. 5th DCA 1997).