UNITED STATES of America

v.

William ATWELL.

No. 06–651–SKG.

United States District Court, D. Maryland.

Jan. 5, 2007.

William C. Atwell, III, Odenton, MD, pro se.

Leonard R. Stamm, Goldstein and Stamm PA, Greenbelt, MD, for William Atwell.

Plymouth D. Nelson, Office of the Staff Judge Advocate, Special Assistant U.S. Attorney, Fort George G Mead, MD, for United States of America.

## MEMORANDUM OPINION AND ORDER

GAUVEY, United States Magistrate Judge.

Defendant Atwell is charged with driving under the influence under Md.Code Ann. Transportation § 21–902(a) and failing to drive right of center under Md.Code Ann. Transportation § 21–301(a) and the Assimilative Crime Acts, 18 U.S.C. §§ 7, 13.

Pending before the Court is defendant William Atwell's ("defendant") motion to suppress all evidence and observations made in this case, because defendant was stopped off of federal property. In his motion, defendant makes two primary points: (1) that when a police officer effectuates a stop outside of his territorial jurisdiction, all evidence obtained after the arrest must be suppressed as illegally obtained; and (2) that a police officer outside of his jurisdiction may not stop an individual for a minor traffic offense. The government acknowledges that the stop and arrest took place beyond the special territorial jurisdiction of the United States, but argues that the arresting officer nonetheless had authority to arrest under *Seip v. State of Maryland,* 153 Md.App. 83, 835 A.2d 187 (2003). The Court agrees with defendant that *Seip v. State* does not au-

thorize federal military officers to make an extra-territorial arrest. Further, the Court finds that there is no authority under any federal or state statute or governing Maryland common law for the extra-territorial arrest. However, the Court finds that the arrest was not unreasonable under the Fourth Amendment to the United States Constitution, and thus the evidence derived as a result of the arrest will not be suppressed and the defendant's motion is DENIED.

## I. *Factual Background*

A suppression hearing was held on November 13, 2006. Based on the testimony and exhibits from that hearing, and stipulations and admissions of the parties, the Court finds the following facts relevant to the suppression issue.

On October 30, 2005, Sergeant Jeffrey M. Jackson ("Sgt. Jackson" or "Sergeant"), a uniformed traffic accident investigator and patrol officer with the Fort Meade Military Police,[1] was riding in an unmarked vehicle. At approximately 2:30 am as he was leaving Fort Meade ("base") in the vicinity of Reece Road, he observed defendant's vehicle traveling eastbound on Maryland Route 175 ("Route 175") at what he believed was approximately 20 miles per hour over the 40 miles per hour speed limit.[2] The area was well lit, and there was no other traffic in the immediate area.

Sgt. Jackson made a right turn through the red light onto Route 175 and drove at a speed of approximately 70 miles per hour for a quarter of a mile to catch up with defendant who was traveling in the left-most lane of the two eastbound traffic lanes. When he was roughly ten feet behind defendant and both vehicles were about one-eighth of a mile from the intersection of Route 175 and Mapes Road, Sgt. Jackson observed defendant's vehicle "driving back and forth in his lane" and repeatedly cross both the line dividing the two eastbound lanes and the solid yellow line that separates the left-most eastbound lane from a dual turn or "suicide" lane.[3] Based on this weaving, the initial instance of which was sufficiently "severe," according to Sgt. Jackson, to prompt a traffic stop, defendant became a suspect for driving under the impairment of alcohol ("DUI"). Sgt. Jackson engaged his unmarked vehicle's emergency equipment which included a siren as well as dash lights, strobe lights in the tail and head lights, and lights on the grill.[4] He remained close behind defendant when the latter turned left onto Mapes Road.[5] Be-

---

1. Sgt. Jackson testified that as of October 30, 2005, he had approximately seven years experience as a traffic officer. He estimated he had made thousands of traffic stops during that time. In the two and a half years he had been stationed at Fort Meade, he had 835 documented stops, the majority of which took place on Routes 32 and 175.

2. Because Sgt. Jackson's radar was not charting east-west traffic at the time he first observed defendant's vehicle, he said he did not include this alleged speeding element in the report he completed following the arrest.

3. Sgt. Jackson continually referred to the solid yellow line defendant crossed as the "center line," but his testimony made clear that the lane line defendant's vehicle allegedly crossed separated an eastbound lane from a dual turn lane. According to Sgt. Jackson, the only time a driver should enter a "suicide lane" when as close as one-eighth of a mile from an intersection is if the left-turn lane is so backed up that to remain in the left-hand lane would block traffic.

4. Sgt. Jackson initially testified that his emergency equipment was engaged for "not even a minute." At a later point in the hearing when being questioned by defendant's attorney, he stated that the equipment was on for perhaps ten seconds.

5. According to standard operating procedures, Sgt. Jackson testified that Fort Meade police are not allowed to pursue a vehicle

lieving that defendant was not going to stop, Sgt. Jackson was ready to call for backup when defendant turned right into a Dunkin' Donuts parking lot located roughly seventy-five feet from Route 175.[6] Having noticed on his own the Sergeant's pursuit of defendant, an Anne Arundel County police officer ("county officer" or "officer") pulled into the parking lot around this same time. Aware that he was outside of the jurisdiction of the United States Army, Sgt. Jackson asked the county officer if he wanted to handle the arrest. Because he considered it Sgt. Jackson's stop, the officer declined.[7]

When Sgt. Jackson approached defendant's vehicle, he noticed a strong odor of alcohol emanating from defendant as well as defendant's bloodshot eyes. Defendant exhibited no abnormal behavior when he exited his vehicle, but his speech was slurred and incoherent before, during, and after Sgt. Jackson's administration of field sobriety tests ("FSTs").[8] The county officer remained on the scene throughout the FSTs and until defendant was taken into custody. Because no "intox operator" was on duty at Fort Meade at the time of the arrest, the county officer, a qualified "intox operator," administered the breath test to defendant.

Defendant was subsequently charged with a Class A misdemeanor, driving un-der the influence per se under Md.Code. Ann. Transportation § 21–902(a), and failing to drive right of center under Md. Code. Ann. Transportation § 21–301(a), under the Assimilative Crimes Act, 18 U.S.C. §§ 7, 13.

## II. *Analysis*

Under the Assimilative Crimes Act, federal police officers may arrest individuals for offenses that occurred in an area where the United States has exclusive or concurrent jurisdiction under the penal laws of the relevant state. 18 U.S.C. § 7; *Wharton's Criminal Procedure* at § 2.9 (14th ed.2006).

In this case, the government concedes that the stop of the defendant did not occur in an area where the United States has exclusive or concurrent jurisdiction. The sole issue before the Court is whether a military police officer, after viewing a traffic violation within his or her jurisdiction, has authority to follow defendant in fresh pursuit and subsequently arrest defendant outside of the jurisdiction.

■ No federal statute grants military police officers authority to engage in fresh pursuit and effect a warrantless arrest outside of their jurisdiction of persons com-

---

based solely on speeding. However, Sgt. Jackson added it is standard operating procedure to pursue DUI suspects until the pursuing officer decides to quit the pursuit or until he is told to do so by his supervisor.

6. At the hearing, Sgt. Jackson stated that there is no shoulder on Rte. 175 but that other drivers subject to traffic stops will pull over into the right-hand eastbound lane, onto the curb, or into a large, approximately thirty-by-fifty-foot gate area. He indicated that by law, a driver has the right to decide where to stop, and in his experience, the Dunkin' Donuts parking lot is a popular choice.

7. Sgt. Jackson testified that on previous occasions, county police have refused to take control of an arrest when the behavior prompting a stop begins within the territory of Fort Meade and the stop is realized just outside of the base's jurisdiction. When faced with such a refusal, Sgt. Jackson stated that he takes care of the case himself.

8. Sgt. Jackson did not specify at the hearing exactly which FSTs he administered to defendant. According to the government, however, he utilized the horizontal gaze nystagmus ("HGN"), the walk-and-turn, and the one-leg stand tests. (Paper No. 8, p. 2).

mitting misdemeanors that do not constitute a breach of the peace.[9]

In the absence of federal statutory authority for such a warrantless arrest, the law of the state where the arrest occurred applies. *United States v. DiRe*, 332 U.S. 581, 589, 68 S.Ct. 222, 92 L.Ed. 210 (1948); *United States v. Haskin*, 228 F.3d 151, 153 (2d Cir.2000); *United States v. Viale*, 312 F.2d 595, 599 (2d Cir.1963)(determining whether IRS agents who arrested without statutory authority had authority to make an arrest); William E. Ringle, *Searches and Seizures, Arrests and Confessions* § 23:23 (2006).

As will be discussed in greater detail below, the Maryland General Assembly has not authorized military police to effect a stop and arrest under the circumstances of this case. Moreover, the common law does not sanction an arrest under the facts here. While the Court takes alcohol-related driving offenses very seriously, where the Maryland legislature has thoroughly regulated when both intrastate police officers and officers from other jurisdictions may engage in fresh pursuit and arrest outside their jurisdiction and the Congress has not legislated in this area, the Court will not invade the province of the state legislature (or the Congress) to create new laws on the subject. *See United States v. Foster*, 566 F.Supp. 1403, 1412 (D.D.C. 1983)("While we share Officer McKenzie's civic concern about reckless, unlicensed drivers, we must also give due regard for the carefully delineated jurisdictional boundaries imposed on local law enforcement personnel by the legislature.").

### A. *Statutory Authority*

■ The government argues that the arrest was authorized under Maryland Code. Ann. Criminal Procedure § 2–301. Under this provision, a law enforcement officer may engage in fresh pursuit of a person "who has committed or is reasonably believed to have committed a misdemeanor in the presence of law enforcement officers in the jurisdiction in which the law enforcement officer has the power to arrest."

In support of its position, the government cites *Seip v. State of Maryland*, 153 Md.App. 83, 835 A.2d 187 (2003)(an Ocean City policeman observed a driving misdemeanor in the city and followed the car outside of his jurisdiction to another Maryland county). *Seip* solely concerns the authority of a city police officer to engage in fresh pursuit beyond his jurisdiction, not the authority of a federal military police officer. The government failed to cite any authority that § 2–301 applies to Fort Meade military police officers.

Indeed, the statutory text suggests that the Maryland legislature did not intend § 2–301 to apply to federal military police officers. The legislature restricted the application of § 2–301 to "law enforcement officer[s] of a jurisdiction in the State who [engage] in fresh pursuit of a person in the State." Md.Code. Ann. Criminal Procedure § 2–301(a). Although the Maryland legislature includes within the definition of a "police officer" persons in 22 state and local government agencies,[10] the definition

---

**9.** Under 16 U.S.C.A. § 1a–6(b), Park Police officers have authority to arrest motorists outside of their jurisdiction for traffic violations observed on the property, if the motorist flees from the national park to avoid arrest. See *United States v. Jones*, 428 F.Supp.2d 497, 502 n. 2 (W.D.Va.2006); *United States v. Fox*, 147 F.Supp.2d 1008 (N.D.Cal.2001). However-

er, the statute only applies to National Park Police and does not grant authority to any other federal officers.

**10.** The section does not define "law enforcement officers," but does define "police officers" as "a person who in an official capacity is authorized by law to make arrests and

does not expressly include either the Fort Meade police department or federal military police. Md.Code. Ann. Criminal Procedure § 2–101.

Moreover, a separate statutory provision addresses the authority of federal enforcement officers to make arrests within the state. Md.Code. Ann. Criminal Procedure § 2–104(b) provides that

(1) subject to the limitations of paragraph (2) of this subsection,[11] a federal law enforcement officer may:

(i) make arrests as set forth in Subtitle 2 of this title [Warrantless Arrests]; and

(ii) execute arrest and search and seizure warrants issued under the laws of the state.

Section 2–104 specifies that only one other subtitle in the chapter, Subtitle 2 (Warrantless Arrests), applies to federal enforcement officers. Under the canon of *expressio unius est exclusio alterius*, by mandating that one subtitle applies to federal enforcement officials, the Maryland legislature revealed its intent that a separate subtitle, Subtitle 3 (Fresh Pursuit), does not apply to federal enforcement officials.

As a result, in the absence of other authority, the Court rejects the government's argument that § 2–301 authorizes the Fort Meade Police Department to engage in fresh pursuit under the facts of this case.[12]

is:(1) a member of the Department of State Police; (2) a member of the Police Department of Baltimore City;(3) a member of the Baltimore City School Police Force;(4) a member of the police department, bureau, or force of a county;(5) a member of the police department, bureau, or force of a municipal corporation;(6) a member of the Maryland Transit Administration Police Force or Maryland Transportation Authority Police Force;(7) a member of the University of Maryland Police Force or Morgan State University Police Force;(8) a special police officer who is appointed to enforce the law and maintain order on or protect property of the State or any of its units;(9) a member of the Department of General Services security force; (10) the sheriff of a county whose usual duties include the making of arrests; (11) a regularly employed deputy sheriff of a county who is compensated by the county and whose usual duties include the making of arrests;(12) a member of the Natural Resources Police Force of the Department of Natural Resources; (13) an authorized employee of the Field Enforcement Bureau of the Comptroller's Office; (14) a member of the Maryland–National Capital Park and Planning Commission Park Police; (15) a member of the Housing Authority of Baltimore City Police Force; (16) a member of the Crofton Police Department; (17) a member of the WMATA Metro Transit Police, subject to the jurisdictional limitations under Article XVI, §§ 76 of the Washington Metropolitan Area Transit Au-

thority Compact, which is codified at §§ 10–204 of the Transportation Article; (18) a member of the Internal Investigative Unit of the Department; (19) a member of the State Forest and Park Service Police Force of the Department of Natural Resources; (20) a member of the Department of Labor, Licensing, and Regulation Police Force; (21) a member of the Washington Suburban Sanitary Commission Police Force; or (22) a member of the Ocean Pines Police Department." Maryland Code Ann. Criminal Procedure § 2–101.

**11.** Paragraph (2) severely circumscribes federal law enforcement authority even in these authorized activities to occasions where they are participating in a joint investigation with state or local law enforcement, are rendering assistance to a police officer, are acting at the request of local or state officers or an emergency exists. § 2–104(b)(2).

**12.** A separate provision authorizes that "a member of a state, county, or municipal law enforcement unit of another state may enter Maryland in fresh pursuit of a person to arrest the person on the ground that the person is believed to have committed a felony in the other state." Md.Code Ann. Criminal Process § 2–305 (2006). State is defined as "any State or the District of Columbia." Md.Code Ann. Criminal Process § 2–304 (2006). Clearly this section does not apply to federal police officers engaging in fresh pursuit of

## B. *Common Law*

Nor does Maryland common law authorize Sgt. Jackson's actions here.

■ Under Maryland common law, a police officer acting outside of the geographical confines of which he is an officer is generally without official authority to apprehend an offender unless he is authorized to do so by a state or federal statute. *See Stevenson v. State*, 287 Md. 504, 413 A.2d 1340, 1343 (1980); *Horn v. City of Seat Pleasant, Md.*, 57 F.Supp.2d 219, 226 (D.Md.1999). *See also People v. Marino*, 80 Ill.App.3d 657, 36 Ill.Dec. 71, 400 N.E.2d 491, 494 (1980); *Perry v. State*, 303 Ark. 100, 794 S.W.2d 141, 144 (1990).[13]

Two exceptions have developed under the common law rule, whereby an officer acting outside his jurisdiction may arrest an individual: (1) if the officer is engaging in fresh pursuit of a suspected felon; or (2) if the officer is acting with the authority of a private citizen to make an arrest. As discussed below, neither of these exceptions apply.

## 1. *Fresh Pursuit*

■ "At common law, a limited exception to [the rule statutorily confining the authority of an officer to a geographic area] developed whereby an officer who is in 'fresh pursuit' of a suspected felon may make a legally binding arrest in a territorial jurisdiction other than the one in which he has been appointed to act[.]" *Seip*, 835 A.2d at 191(quoting *Stevenson*, 413 A.2d at 1343); *State v. Cuny*, 257 Neb. 168, 595 N.W.2d 899, 903 (1999). The doctrine, however, is limited to felony arrests and does not extend to misdemeanors. *See Jones*, 428 F.Supp.2d at 502 n. 2 ("There is a common law doctrine of extra-territorial fresh pursuit, but it is limited to felony arrests."); *Boston v. Baltimore County Police Dep't*, 357 Md. 393, 744 A.2d 1062 (2000); *Cuny*, 595 N.W.2d at 903.

## 2. *Authority as a Private Citizen*

■ Under the common law, a police officer may also make an arrest outside of his jurisdiction as a private citizen. *See Stevenson*, 413 A.2d at 1343; *Perry*, 794 S.W.2d at 143 (citations omitted); *Horn*,

individuals believed to have committed a misdemeanor.

Another provision authorizes that "[a] police officer may arrest without a warrant a person who commits or attempts to commit a felony or misdemeanor in the presence or within the view of the police officer." Md. Code Ann. Criminal Procedure § 2–202(a) (2006). Of course, a military police officer is not within the definition of police officer.

13. The same restrictions apply to military police officers. See Major Matthew Gilligan, *Opening the Gate?: An Analysis of Military Law Enforcement Authority Over Civilian Lawbreakers On and Off the Federal Installation*, 161 Mil. L.Rev. 1, 31 (1999). Indeed, the restrictions might even be greater for military law enforcement officers, as military police officers have never been granted broad statutory authority to arrest civilians. *Id;* Administrative & Civil Law Dep't, The Judge Advocate General's School, U.S. Army, JA–221

Law of Military Installations Deskbook at 2–305 (Sept.1996)("Congress has not granted any statutory authority to arrest civilian lawbreakers."). "A firmly rooted principle of American government is that the federal armed forces shall be subordinate to civil authorities." Gilligan, 161 Mil. L.Rev. at 31. *Accord* 9 Op. Att'y Gen. 516, 522 (1860)("[M]ilitary power must be kept in strict subordination to the civil authority, since it is only in the aid of the latter that the former can act at all."). As a result, while on military property military officers have the same authority that civilian law enforcement officers have, *i.e.*, to maintain order, security, and discipline on a military reservation, *see Kennedy v. United States*, 585 F.Supp. 1119, 1123 (D.S.C.1984), such general authority has not been granted for areas where the United States Army does not have exclusive or concurrent jurisdiction.

57 F.Supp.2d at 226; *Moore v. Oliver,* 347 F.Supp. 1313, 1316 (W.D.Va.1972). The common-law exception appears to extend to military police officers.[14] This exception has been acknowledged by the military itself.[15]

#### i. *Probable Cause*

 For a citizen's arrest to be valid, a private citizen must have probable cause to believe that a felony has occurred. *See, e.g., Horn,* 57 F.Supp.2d at 225; *Garner v. State,* 779 S.W.2d 498, 501 (Tex.App.1989) (a private citizen must observe enough of an action to establish probable cause that a crime is being committed); 1 *Drinking/Driving Litigation: Criminal and Civil* § 5:9 (2d ed. Sept.2006) ("The arresting citizen must have probable cause to believe that the individual was driving alcohol-impaired."). In the alternative, a private citizen may arrest another if a misdemeanor constituting a breach of the peace is committed in his presence. *See, e.g., Hudson v. Commonwealth,* 266 Va. 371, 585 S.E.2d 583, 588 (2003) (citations omitted); *Horn,* 57 F.Supp.2d at 225; *State v. Gustke,* 205 W.Va. 72, 516 S.E.2d 283, 291–292(1999) (citations omitted).

 There is no authority under Maryland law for a citizen's "Terry" stop based on reasonable suspicion, rather than probable cause.[16] Accordingly, if Sgt. Jack-

---

14. *See United States v. Mullin,* 178 F.3d 334 (5th Cir.1999)("We need not decide whether, on the facts before us, Military Police had statutory authority to arrest Mullin; at the very least, they could make a citizen's arrest."). *See also U.S. v. Sealed Juvenile 1,* 255 F.3d 213, 217 (5th Cir.2001) (citing *Mullin,* 178 F.3d at 338, and stating that military police have the same authority as a private person to make an arrest under Texas law); Gilligan, 161 Mil. L.Rev. at 38 ("Like other law enforcement officials, military officials have the legal authority to depart their installations and conduct citizen arrests.... As long as the off-post criminal act is a felony or, in most states, a misdemeanor breach of the peace, the military official who observes it, or is requested to assist in preventing it, may respond.") (citing in part *Mullin,* 178 F.3d at 338 and 32 C.F.R. § 503.1 (1998) (reserved)). *Cf. Brown v. U.S.,* 338 F.2d 543, 545 (D.C.Cir. 1964) (noting that, in the case before it, the military police "performed the functions of police officers even though in a legal sense they had no power to make any more than a citizen's arrest").

15. *See U.S. v. Shepherd,* 33 M.J. 66, 69 (CMA 1991) (not questioning right of first airman to effectuate a citizen's arrest but analyzing right of self-defense asserted by second airman against "citizen-arrester"); *U.S. v. Walker,* 1953 WL 1943, 10 C.M.R. 773 (AFBR 1953) (Gingery, J.A. dissenting), *rev'd on other grounds by U.S. v. Walker,* 1953 WL 2191(CMA), 12 C.M.R. 111, 3 USCMA 355 (CMA 1953) ("Persons in the military service are no less 'private persons' for the purpose of arresting those who commit crimes in their presence. Being in the Service does not restrict their right nor duty to do it; nor, probably relieve them from criminal responsibility for not doing it.") (quoting 2 Alexander, *The Law of Arrest* § 472, p. 1397); U.S. Dep't. Of Army, Reg. 195–2, Criminal Investigation Activities, para. 3–21(e) (Oct. 30, 1985), available at http://www.army.mil/usapa/epubs/pdf/r 195_2.pdf (last visited 10/19/06) ("Nothing in this regulation is intended to restrict ... the personal authority of special agents under various state laws concerning citizen arrests."); U.S. Dep't. Of Army, Field Manual 19–10, Law Enforcement Operations, 110 (Sept. 30, 1987) ("All members of the military have the ordinary right of private citizens to assist in maintenance of the peace. Where, therefore, a felony or a misdemeanor amounting to a breach of the peace is being committed in his presence, it is the right and duty of every member of the military service, as of every civilian, to apprehend the perpetrator.").

16. Some courts have held that a private citizen may not make a Terry stop based solely on reasonable suspicion. *See Garner,* 779 S.W.2d at 501 (private citizen does not have authority to make a Terry stop); *Commonwealth v. Gullick,* 386 Mass. 278, 435 N.E.2d 348, 351 (1982); (accepting defendant's argument that under New Hampshire law, a private citizen may not make an investigative stop, but noting that an officer's subjective

son's extra-territorial actions vis a vis the defendant are to be justified under the private citizen arrest doctrine, he must have had probable cause.

#### ii. *Breach of the Peace*

■ Maryland follows the majority common law rule whereby a private citizen may effectuate an arrest under two circumstances:

(a) there is a felony being committed in his presence or when a felony has in fact been committed whether or not in his presence, and the arrester has reasonable ground (probable cause) to believe the person he arrests has committed it; or

(b) a misdemeanor is being committed in the presence or view of the arrester which amounts to a breach of the peace.

*Horn*, 57 F.Supp.2d at 226 (quoting *Stevenson*, 413 A.2d at 1345); 5 Am.Jur.2d Arrest § 57 (2006).

Thus, in order for Sgt. Jackson's arrest to be authorized under the common law, he must have had probable cause to believe that a misdemeanor has been committed and that misdemeanor constituted a breach of the peace. Sgt. Jackson testified to his observation of defendant's speeding, crossing over the solid yellow line, separating his travel lane from the dual turn lane several times and that when defendant began crossing over that solid yellow line, he suspected him of driving under the impairment of alcohol. Ultimately, Sgt. Jackson charged defendant with failing to drive right of center under Md.Code Ann. Transportation § 21–301(a) and driving under the influence *per se* under Md.Code Ann. Transportation § 21–902(a), under

the Assimilative Crimes Act, 18 U.S.C. §§ 7, 13.

■ A breach of the peace is "disorderly dangerous conduct disruptive of private peace." *Great Atlantic & Pacific Tea Co. v. Paul*, 256 Md. 643, 261 A.2d 731, 739 (1970); *Horn*, 57 F.Supp.2d at 226. *Accord State v. Peer*, 320 S.C. 546, 466 S.E.2d 375, 379 (1996)(breach of the peace is violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence); *Hudson*, 585 S.E.2d at 588 (a breach of the peace is an offense disturbing the public peace or a violation of public order or public decorum); 12 Am Jur.2d Breach of the Peace etc. § 4 (1964) ("Throughout the various definitions appearing in the cases there runs the proposition that a breach of the peace may be generally defined as such a violation of the public order as amounts to a disturbance of the public tranquility, by act or conduct either directly having this effect, or by inciting or tending to incite such a disturbance of the public tranquility. Under this general definition, therefore, in laying the foundation for a prosecution for the offense of breach of the peace it is not necessary that the peace actually be broken; commission of an unlawful and unjustifiable act, tending with sufficient directness to breach the peace, is sufficient.").

■ A "simple traffic violation" does not constitute a breach of the peace. *Horn*, 57 F.Supp.2d at 226 (holding that officer did not have authority to arrest outside of his jurisdiction a private citizen for speeding 75 mph in a 55 mph zone). *See also Kunkel v. State*, 46 S.W.3d 328,

---

intention to make only an investigative stop does not negate probable cause to make an arrest where such probable cause exists). *Sealed Juvenile 1*, 255 F.3d at 219 (5th Cir. 2001) (even if customs officer only intended

to make a Terry investigatory stop, "his subjective rationale for stopping the pickup truck does not invalidate the detainment as long as there existed an objective probable cause to arrest" defendant).

331 (Tex.App.2001) (the "lower range" of erratic driving would not generally amount to a breach of the peace); *Commonwealth v. Borek*, No. 05–128, 68 Va. Cir. 323, 2005 WL 1862335, at *3 (Va. Cir. Ct.2005) (potentially speeding and making a rolling stop before turning right at a red light is not a breach of the peace sufficient to allow for valid citizen's arrest). Moreover, while "a traffic stop is less intrusive than a formal arrest, a private citizen should not be able to intrude upon another citizen's rights in this way." *Horn*, 57 F.Supp.2d at 226 (citing *Knowles v. Iowa*, 525 U.S. 113, 119, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998)).

Cases from other jurisdictions have found that traffic offenses "egregious enough to threaten disaster or pose a potentially perilous public risk may constitute a breach of the peace." *See Sealed Juvenile 1*, 255 F.3d at 218 (off-duty customs official had authority under Texas law to arrest as a private citizen individual for erratic driving of pickup truck, veering in and out of proper lane, variously crossing the center line and moving onto to the emergency shoulder of the road, because conduct was a breach of the peace which "includes all violations of public peace and order"). *See also Hudson*, 585 S.E.2d at 588 (driver weaving over the road, almost forcing driver off the road constituted a breach of the peace as driving imperiled others, regardless of whether driver was found to be intoxicated); *State v. Arroyos*, 137 N.M. 769, 115 P.3d 232 (App.2005)(reasonable person would conclude defendant committed a breach of the peace when he drove erratically at 1:30 am, including braking constantly and crossing the center line into ongoing traffic); *People v. Niedzwiedz*, 268 Ill.App.3d 119, 205 Ill.Dec. 837, 644 N.E.2d 53 (1994) (breach of the peace when defendant drove car across center line and fog line on several occasions). Notably, driving under the influence of alcohol has specifically been labeled a breach of the peace. *Gustke*, 516 S.E.2d at 291; 11 C.J.S. Breach of the Peace § 5 (1995)(operation of motor vehicle while intoxicated is an activity which threatens public security and as such amounts to a breach of the peace); 5 Am.Jur.2d Arrest § 67 (1995)(officer may arrest for DUI "even where the power to arrest without warrants is limited to breaches of the peace, since this offense is held to constitute a breach of the peace, or at least a prospective and anticipated breach.").

Thus, it appears clear under these authorities, that if a private citizen had probable cause for an arrest for driving while impaired, an arrest would be justified. It also appears clear under these authorities that even if a private citizen had probable cause for an arrest for speeding (at least in the 20 mph over speed limited suggested here), an arrest would not be justified. The question here is closer: whether the erratic driving charged here under Md.Code Ann. Transportation § 21–301(a) constitutes a breach of the peace.

Maryland courts have characterized the conduct of "crossing the line into an oncoming traffic line ... [as] inherently dangerous." *Dowdy v. State*, 144 Md.App. 325, 798 A.2d 1, 4 (2002). *Accord Edwards v. State*, 143 Md.App. 155, 792 A.2d 1197, 1206 (2002) (There is "danger associated with veering into an opposing lane of traffic, even briefly."). The Sergeant in the case *sub judice* charged defendant with "failing to drive right of center." However, Sgt. Jackson's hearing testimony revealed that defendant's vehicle was not repeatedly crossing into the *on-coming traffic lane* but veering back and forth over the solid yellow line separating his lane from a *dual turn lane*. This distinction is noteworthy, and the Court finds

that defendant's driving, though erratic, was simply too short-lived and too minimally reckless to constitute a breach of the peace under Maryland law.[17] Sgt. Jackson further testified that he only observed defendant's weaving after he had driven his unmarked vehicle right up behind that of defendant. While the Court does not necessarily agree with defendant that this could have caused defendant's *repeated* crossing of the yellow line, it does appreciate that, for a driver, it is disconcerting to suddenly find a vehicle (here unmarked) only ten feet behind one's own. Moreover, at the hearing, Sgt. Jackson stated that there was nothing unusual or erratic about defendant's subsequent left-hand turn onto Mapes Road or his turn into the Dunkin' Donuts parking lot. Based on this evidence as well as the fact that, fortunately, the safety of no other drivers on the road was imperiled, the Court concludes that defendant's driving was insufficiently reckless or erratic to amount to a breach of the peace necessary to support a citizen's arrest.

### iii. *"Under the Color of Office" Doctrine*

██ Even if defendant's driving under the influence amounted to a breach of the peace as a matter of law, before determining whether a citizen's arrest was valid in this case, the Court would have to decide whether Sgt. Jackson used the powers of his office to obtain the probable cause upon which the arrest for DUI was made. The Court concludes that there was a use of "the color of office" and that consequently Sgt. Jackson's actions cannot be legitimized as a private citizen's arrest.

██ A police officer acting outside of his jurisdiction "may not utilize *the power of [his] office* to gather evidence or ferret out criminal activity not otherwise observable[.]" *State v. Phoenix,* 428 So.2d 262, 266 (Fla.Dist.Ct.App.1982)(emphasis in original). As a result, a police officer may not conduct a citizen's arrest "under the color of his office." *Stevenson,* 413 A.2d at 1343. "Color of the office refers not to the modus operandi of the arrest, but whether official authority was used to gain access to the information that lead to the belief that an arrest should be made." *Id. See also Hudson,* 585 S.E.2d at 586 (law enforcement officer is prohibited from using indicia of authority to collect evidence that a private citizen would be unable to gather); *Niedzwiedz,* 205 Ill.Dec. 837, 644 N.E.2d at 55 ("[a] police officer exceeds his authority to make a citizen's arrest ... when he uses the powers of his office to gather evidence unavailable to the private citizen outside his jurisdiction"); *Arroyos,* 115 P.3d at 234; *Gustke,* 516 S.E.2d at 292.

Courts are widely split as to what constitutes exercise of the "under the color of office" authority inconsistent with a citizen's arrest. Some courts hold that a police officer acting as a police officer cannot make a citizen's arrest. *See Commonwealth v. Bradley,* 724 A.2d 351 (Pa.Super.Ct.1999), *appeal denied* 560 Pa. 696, 743 A.2d 913 (1999)(off-duty officer who stopped driver for erratic behavior and detained him until local law enforcement could arrive did not make a citizen's arrest because his actions were consistent with those of an officer who had been trained to do routine police stops); *People v. Williams,* 4 N.Y.3d 535, 797 N.Y.S.2d 35, 829 N.E.2d 1203 (2005)(police officer who acts under color of law and with all the

---

17. When stating that defendant's driving was not erratic enough or long-lasting enough to constitute a breach of the peace, the Court does not also imply that his driving was insufficiently erratic to warrant a traffic stop; the two issues are separate. The reasonableness of the stop made by Sgt. Jackson will be discussed below in Section II(C)(1).

accouterment of official authority cannot make a valid citizen's arrest); *State v. Shipman*, 370 So.2d 1195, 1197 (Fla.App. 1979) ("under the color of office" refers to a law enforcement officer actually holding himself out as a police officer, by either wearing his uniform or in some other manner openly asserting his official position, in order to observe the unlawful activity involved or the contraband seized). Other courts do not focus on the status of the police officer as a police officer but whether he uses the indicia or powers as a police officer to gain the probable cause for the arrest. *See Wilson v. Commonwealth*, 45 Va.App. 193, 609 S.E.2d 612 (2005)(mere fact that officer is in his uniform does not mean officer may not undertake a valid citizen's arrest); *Hudson*, 266 Va. 371, 585 S.E.2d 583 (activation of emergency lights on police vehicle, commanding defendant to stay in car, and brandishing service firearm did not amount to "under color of office" violation by officer acting outside of his territorial jurisdiction when he made no attempt to gather any additional evidence beyond witnessing defendant's erratic driving); *State v. Furr*, 723 So.2d 842 (Fla. 1st Dist.1998)(valid citizen's arrest by officer who was in uniform and driving a police vehicle with flashing blue lights); *Wright*, 58 Md.App. 447, 473 A.2d 530 (Ct.Sp.App.1984) (actions observed by police officer in parking lot where narcotics transaction took place were "no more or less than any other private citizen in the parking lot would or could have seen had they looked").

While not without doubt,[18] Maryland courts have found that the degree of an arresting officer's use of his law enforcement powers, not his status, determines whether a citizen's arrest has occurred. The Maryland Court of Appeals found no exercise of the under the color of office authority when Washington, D.C. police officers made citizen's arrests upon witnessing the aftermath of a bank robbery in Maryland. *Stevenson*, 287 Md. 504, 413 A.2d 1340. The court noted that "the Washington detectives did not see the cloud of red smoke or the flight of petitioners because of their status as officers; they merely observed what every private citizen, close enough to do so, could have perceived." *Id.* at 1344.

In addition, the notion that a law enforcement official must explicitly hold himself out as a private citizen in order to effectuate a valid citizen's arrest seems at odds with the prevailing view in other jurisdictions. Several courts, with which this Court is inclined to agree, have expressed incredulity that a police officer outside of his territorial jurisdiction might be denied the right to make a citizen's arrest simply because he happens to be wearing a uniform or riding in a police car at the time he witnesses a felony or a breach of the peace. *Gustke*, 516 S.E.2d at 293 (labeling such a scenario "ridiculous") (citing *Phoenix*, 428 So.2d at 266 (citations omitted)). *See also Sealed Juve-*

---

**18.** Recently, the Maryland Court of Appeals suggested that a police officer may only make an arrest as a private citizen if he was "acting or purporting to act in the capacity of a private citizen." *Boston*, 744 A.2d at 1068 (in case of officer discipline, noting that the officer was not acting as a private citizen when he was on active duty, drove a marked police car with overhead lights flashing and siren intermittently blazing, and remained in contact with his dispatcher). However, the hold-

ing in *Boston* is only dicta. The primary legal focus in *Boston* was whether the officer had violated Md.Code (1957, 1966 Repl.Vol.), Article 27, § 594B(1)(2)(ii) (now Md.Code Ann. Criminal Procedure § 2–102(b)(2)), which states that a Maryland "police officer may not enforce the provisions of the Maryland Vehicle Law beyond the officer's sworn jurisdiction." *See Boston*, 357 Md. 393, 744 A.2d 1062.

*nile I*, 255 F.3d at 218 ("it would be counter-intuitive to deny the right of citizen's arrest to a citizen who happens to be a federal law enforcement officer"); *Hudson*, 585 S.E.2d at 587 (finding it "absurd ... that a law enforcement officer, solely because he happens to be in uniform and in a police car" could not pull someone over for driving erratically).

What is most essential in a determination regarding the validity of a citizen's arrest and the impact of the "under the color of office" doctrine is whether the arresting officer acting outside of his jurisdiction had probable cause for the arrest based *solely* on evidence that a private citizen might observe and have the ability to interpret. Clearly, Sgt. Jackson, like any driver on the road, had the ability to observe the speed and the erratic driving of the defendant. The Sergeant, again like any private citizen, could observe not only the erratic driving, but also smell the alcohol emanating from defendant's person and observe defendant's bloodshot eyes and slurred and incoherent speech, once he was pulled over. The only remaining question is whether the Sergeant's admitted use of his emergency lights and siren to pull over defendant, after which he made the aforementioned physical observations of intoxication, is such an exercise of his "color of office" that those physical observations could not form the basis of a valid citizen's arrest for driving under the influence. The Court concludes that, in the instant case, a private citizen would not have been able to gather evidence of defendant's intoxication beyond his erratic driving without recourse to the type of emergency lights and siren used by Sgt. Jackson. *See Stevenson*, 413 A.2d at 1343 (inquiry's focus is on whether an arresting officer used his official authority "to gain access to the information that lead to the belief that an arrest should be made"). Without the ability to easily get defendant's attention and without any apparent show of authority, it is highly unlikely that a private citizen would have been able to effectuate a stop in the first instance and make physical observations of defendant in the second. Absent the type of evidence gathered by Sgt. Jackson *after* defendant pulled into the Dunkin' Donuts parking lot, probable cause would be lacking to make a citizen's arrest of defendant for the misdemeanor of driving under the influence of alcohol.

In addition to the physical observation evidence obtained through the use of emergency lights and sirens, this Court finds that any evidence resulting from a field sobriety test is without question beyond the scope of evidence attainable by a private citizen.[19] *Wilson*, 609

---

19. According to the government, Sgt. Jackson asked defendant to perform three FSTs: the horizontal gaze nystagmus ("HGN"), the walk-and-turn, and the one-leg stand. (Paper no. 8, p. 2). "In the HGN test, the officer observes the eyes of a suspect as the suspect follows a slowly moving object[,] such as a pen or small flashlight, horizontally with his eyes. The examiner looks for three indicators of impairment of each eye: if the eye cannot follow a moving object smoothly, if jerking is distinct when the eye is at maximum deviation, and if the angle onset of jerking is within 45 degrees of center. If, between the two eyes, four or more clues appear, the suspect likely has a BAC of 0.10 or greater." Enforcement and Justice Services Provision of the National Highway Traffic Safety Administration, The *Highway Safety Book*, Part Five, available at http://ww w.nhtsa.dot.gov/PEOPLE/INJURY/enforce/DESKBK.html# SFST (last visited September 12, 2006). While a private citizen, who has stopped a driver based on a suspicion of drunken driving, might have a pen or flashlight readily to place in front of the eyes of the driver, it is doubtful that same citizen would have the training and knowledge to determine whether the driver's nystagmus was "exaggerated," thereby implying alcohol impairment. *See id.*

S.E.2d at 618 ("assuming without deciding that the administration of field sobriety tests is the sort of investigation that would implicate the 'color of office' doctrine"); *Commonwealth v. Thompson,* No. 05–131, 2005 WL 3007782, at *4 (Va. Cir. Ct.2005) (a private citizen would "at most" be able to gather evidence "only from plain observation" of defendant's person and would not be able to gather evidence of a field sobriety test). If Sgt. Jackson used the results of the FSTs to establish probable cause that defendant had been driving while under the influence of alcohol, then he employed the powers of his office and tainted the validity of a citizen's arrest in this instance. *See* 1 *Drinking/Driving Litigation: Criminal and Civil* § 5:5 (2d ed. Sept.2006)("Field sobriety tests are generally relied upon to determine probable cause after the stop of the vehicle."); *Blasi v. State,* 167 Md.App. 483, 893 A.2d 1152, 1167 (Md.Ct.Sp.App.2004) (citation omitted).

In sum, Sgt. Jackson lacked probable cause for a citizen's arrest of Mr. Atwell under the facts. The erratic driving he observed does not constitute a breach of the peace. While drunken driving may constitute a breach of the peace, Sgt. Jackson only gained probable cause to effect a citizen's arrest utilizing the color of his office, that is, use of his emergency lights and siren.

## C. *Reasonableness of Stop and Arrest Under the Fourth Amendment to the United States Constitution*

Having concluded that the arrest was invalid under Maryland law, the Court must then determine whether the initial stop and subsequent arrest were unreasonable under the Fourth Amendment. *See U.S. v. Van Metre,* 150 F.3d 339, 347 (4th Cir.1998) (finding the fact that an arrest may have violated state law to be "irrelevant" in evaluating a motion to suppress); *U.S. v. Clyburn,* 24 F.3d 613, 616 (4th Cir.1994) ("[T]he proper standard for evaluating illegal ... seizure claims in federal courts has uniformly been whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution.") (citations omitted); *Street v. Surdyka,* 492 F.2d 368, 371 (4th. Cir.1974) (holding that even if officer "violated Maryland arrest law, he cannot be liable under § 1983 unless he also violated the federal constitutional law governing ... arrests.").

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures[.]" U.S. Const. Amend. IV. It does not bar all searches and seizures but only those that are "unreasonable." *U.S. v. Reid,* 929 F.2d 990, 992 (4th Cir.1991)

While less complex than the HGN, the walk-and-turn and one-leg tests also require a level of training and knowledge on the part of the person administering the test. In the former test, "the subject is directed to take nine steps, heel-to-toe, along a straight line.... The examiner looks for seven indicators of impairment: if the suspect cannot keep balance while listening to the instructions, begins before the instructions are finished, stops while walking to regain balance, does not touch heel-to-toe, uses arms to balance, loses balance while turning, or takes an incorrect number of steps." *Id.* In the latter test, the subject is "instructed to stand with one foot approximately six inches off the ground and count aloud by thousands." *Id.* The examiner times the subject for thirty seconds and "looks for four indicators of impairment, including swaying while balancing, using arms to balance, hopping to maintain balance, and putting the foot down." *Id.* There is little doubt that many private citizens are able to recognize staggering and other obvious physical impairments that may result from intoxication. It is less clear that a private citizen would recognize the various subtleties of the walk-and-turn and one-leg tests.

**571**

(holding that administration of breathalyzer tests to suspected drunk drivers is reasonable under the Fourth Amendment) (citing *Skinner v. Ry. Labor Exec. Assoc.,* 489 U.S. 602, 618, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)). *See also Brown v. State,* 132 Md.App. 250, 752 A.2d 620, 626 (Ct.Spec.App.2000) (citation omitted). The main focus of inquiry is "whether the 'particular governmental invasion of a citizen's personal security' is reasonable looking at all of the circumstances." *Horn,* 57 F.Supp.2d at 225 (finding officer's actions unreasonable given that he did not effectuate a valid citizen's arrest) (quoting *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The reasonableness assessment is objective; one must ask if the facts available to the arresting officer at the time of the search or seizure would "warrant a [person] of reasonable caution in the belief that the action taken was appropriate." *Terry,* 392 U.S. at 21–22, 88 S.Ct. 1868 (internal quotations and citations omitted).

### 1. *Reasonableness of the Traffic Stop*

■■■ Traffic stops, like arrests, are detentions that implicate the Fourth Amendment. *See Blasi,* 893 A.2d at 1158 (citations omitted); *U.S. v. Foreman,* 369 F.3d 776 (4th Cir.2004) ("Temporary detention of an individual during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of a person within the meaning of the Fourth Amendment.") (citation omitted). A traffic stop is constitutionally reasonable when a police officer has either "probable cause to believe that a traffic violation has oc-

curred[,]" *Whren v. U.S.,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), or "reasonable articulable suspicion that criminal activity may be afoot." *Blasi,* 893 A.2d at 1158 (quoting *Terry,* 392 U.S. at 30, 88 S.Ct. 1868) (quotation marks omitted). In evaluating whether a stop is supported by reasonable suspicion, a court must look to the circumstances known to the officer at the time of the stop as well as "the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *U.S. v. Smith,* 396 F.3d 579 (4th Cir.2005) (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868). *See also Foreman,* 369 F.3d at 782 ("[c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street") (quoting *U.S. v. Lender,* 985 F.2d 151, 154 (4th Cir.1993)).

■■■ In the instant case, the Court finds that Sgt. Jackson had both probable cause to believe that defendant had committed a traffic violation as well as a constitutionally reasonable suspicion that criminal activity, *i.e.,* a DUI, was taking place. First, Sgt. Jackson testified that he witnessed defendant's vehicle cross both the solid yellow line separating his lane from the dual turn lane and the line dividing his lane from the other eastbound lane on Route 175. This weaving provided the Sergeant with probable cause to believe that defendant had violated Maryland State traffic code.[20] Moreover, the traffic offense in question, *i.e.* defendant's erratic driving, originated on a part of Route 175 which all parties agree is an area within Fort Meade's jurisdiction. *Cf. U.S. v. Si-*

---

20. The Court need not determine whether Sgt. Jackson should have issued defendant a citation for violation of Md.Code. Ann. Transportation § 21–301(a), which governs failures to stay on the right side of the roadway, or Md.Code. Ann. Transportation § 21–309, which generally requires vehicles to stay within a single lane. Based on defendant's erratic driving, the Sergeant had probable cause to believe that at least one, if not both, of these code provisions had been violated.

*mon,* 368 F.Supp.2d 73, 76 (D.D.C.2005) ("[a] Metro Transit Police official cannot patrol the streets of D.C. making traffic stops and/or arrests *unless* the offenses in question originated on or against [Washington Metropolitan Area Transit Authority] facilities" (quoting *Foster,* 566 F.Supp. 1403)) (emphasis in original). Moreover, Sgt. Jackson testified that he put on his emergency lights and siren while on Route 175. Therefore, when Sgt. Jackson established probable cause and initiated the stop, he was not acting extra-territorially. A stop under these circumstances is constitutionally reasonable.

▪ Second, at the motion to suppress hearing, Sgt. Jackson stated that defendant became a DUI suspect the moment he began crossing the center line. Given the Sergeant's substantial experience as a traffic officer, his familiarity with the area, the late-night/early-morning hour at which he witnessed defendant's failure to stay in his lane, and the repeat nature of that failure, his suspicions that defendant may have been driving under the influence were reasonable and supported initiating a stop. As has been stated by the Fifth Circuit, erratic driving alone does not establish probable cause for driving under the influence, but it does give "an officer an articulable reasonable suspicion to make an investigatory stop." *Sealed Juvenile I,* 255 F.3d at 219, n. 1 (citing *Yeager v. State,* 23 S.W.3d 566 (Tex.App.2000)). *See also Edwards,* 792 A.2d at 1205 (citing *U.S. v. Barahona,* 990 F.2d 412, 414 (8th Cir.1993) in which the court found that a change of lanes without use of a turn signal followed by a partial veering onto the shoulder were sufficiently erratic to constitute "a legitimate reason" for a traffic stop). The very purpose of such a stop, even in the absence of other vehicles in the immediate area at that exact moment, "is to determine if a driver should be arrested for his own protection and for the safety of others on the highway." *See Dowdy,* 798 A.2d at 5, n. 4. Based on the evidence before this Court, it finds nothing unreasonable in Sgt. Jackson's stop of defendant in order to further investigate the possibility that defendant was driving in an impaired or alcohol-influenced state. This is especially so in light of the fact that Sgt. Jackson formed his reasonable articulable suspicion while both he and defendant were within the sergeant's zone of authority, as noted above. There is simply no evidence that Sgt. Jackson initiated the stop with the intent to fully effectuate it beyond the exclusive or concurrent jurisdiction of Fort Meade.

### 2. *Reasonableness of the Arrest*

▪ The question of whether Sgt. Jackson's arrest of defendant is constitutionally reasonable is a somewhat more difficult question than that related to the traffic stop. A few courts have taken a hard line. In *Ross v. Neff,* 905 F.2d 1349 (10th Cir.1990), for example, the Tenth Circuit held that "a warrantless arrest executed outside of an arresting officer's jurisdiction is analogous to a warrantless arrest without probable cause. Absent exigent circumstances, such an arrest is presumptively unreasonable" (citations omitted).[21] *See also Simon,* 368 F.Supp.2d at 76 (holding that D.C. metro transit police officer's extra-jurisdictional arrest violated defendant's Fourth Amendment right to be free from unreasonable search and seizure);

---

**21.** However, in a more recent decision, in *U.S. v. Mikulski,* 317 F.3d 1228, 1233 (10th Cir.2003), the Tenth Circuit held that the "officers' violation of law is not without more, necessarily a federal constitutional violation."

The Court distinguished Ross as involving infringement on the authority of Native American territory, as opposed to different local jurisdictions of a single state. *Id.*

*Foster*, 566 F.Supp. at 1412 ("When a law enforcement official acts beyond his or her jurisdiction, the resulting deprivation of liberty is just as unreasonable as an arrest without probable cause."). *Cf. Bissonette v. Haig*, 776 F.2d 1384, 1386–1387 (8th Cir.1985) (holding that the use of military personnel to enforce civilian law is limited and any search or seizure under circumstances exceeding those limitations is unreasonable under the Fourth Amendment). The majority view, including decisions in the Courts of Appeal for the Seventh and Eighth Circuits, and more recent decisions in the Tenth Circuit, firmly rejects the notion that a lack of state statutory authority to make an arrest constitutes a *per se* violation of the Fourth Amendment.[22] The Fourth Circuit has not ruled on this question. However, as observed by the court in *U.S. v. Jones*, 428 F.Supp.2d 497, 503 (W.D.Va.2006), the Fourth Circuit opinion in *U.S. v. Mason*, 52 F.3d 1286 (4th Cir.1995), lends support to the proposition that "the fact that an arrest may have violated a territorial limitation statute . . . is merely a factor to be considered when deciding whether [the Fourth Amendment] mandate has been followed." This Court agrees with the developing majority view and finds that, standing alone, Sgt. Jackson's arrest of defendant outside of Fort Meade's territorial jurisdiction does not rise to the level of a constitutional violation.

 In order to properly assess the reasonableness of an extra-jurisdictional arrest, a court should consider a number of factors and weigh the "individual's interest in privacy and freedom from unreasonable seizures against [the government] and society's interest in protecting [citizens] from criminal conduct." Nicholas L. Lopuszynski, Father Constitution, Tell the Police to Stay on Their Own Side: Can Extra-jurisdictional Arrests Made in Direct Violation of State Law Ever Cross the Fourth Amendment's "Reasonableness" Line?, 53 DePaul L. Rev. 1347, 1369, 1392–1394 (Spring 2004) [herein after "Lopuszinski"] (citing *Wyoming v. Houghton*, 526 U.S. 295, 299–300 (1999); *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985); *Pasiewicz*, 270 F.3d at 527; *Abbott*, 30 F.3d at 998 (Arnold, C.J., dissenting)). Primary to the determination of the reasonableness of any warrantless arrest is, of course, the existence of probable cause for the arrest. (factor one) *See Jones*, 428 F.Supp.2d at 503 (citing *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004)). But a find-

**22.** *U.S. v. Mikulski*, 317 F.3d 1228 (10th Cir. 2003)(Utah County officers' violation of state law requiring them to notify local law enforcement officials prior to exercising their own authority in Salt Lake County did not, "without more, necessarily" amount to a federal constitutional violation) (citing *U.S. v. Baker*, 16 F.3d 854, 856 n. 1 (8th Cir.1994)); *Pasiewicz v. Lake County Forest Preserve District*, 270 F.3d 520 (7th. Cir.2001) ("a violation of a state statute is not a *per se* violation of the federal constitution"); *Abbott v. City of Crocker*, 30 F.3d 994, 998 (8th Cir.1994) (holding that, as a matter of law, an arrest in violation of state law does not necessarily constitute a violation of the Fourth Amendment); *Jones*, 428 F.Supp.2d at 502; *U.S. v. Peach*, 327 F.Supp.2d 1081 (D.N.D.2004) (search of defendant's vehicle by Bureau of Indian Affairs ("BIA") officer outside of Indian reservation would not be *per se* unreasonable under the Fourth Amendment). *Cf. U.S. v. Mason*, 52 F.3d 1286, 1289 n. 5 (4th Cir. 1995) (finding that even if U.S. Customs Service was not authorized to execute a search warrant that lead to the discovery and seizure of drug paraphernalia from defendant's place of business, suppression was not warranted because unauthorized search did not rise to the level of a constitutional violation warranting suppression of evidence); *U.S. v. Sawyer*, 441 F.3d 890 (10th Cir.2006) (Kansas police officers' acting without authority under Oklahoma law to request defendant's consent to search business premises did not render voluntary consent invalid).

ing of probable cause does not conclude the analysis. Other relevant factors in the reasonableness analysis under the Fourth Amendment include the degree of the officer's compliance with state law [23] (factor 2); the fact that officers were acting between political subdivisions of the same state [24] (factor 3); the presence of exigent circumstances or the lack thereof [25] (factor 4); the location where the offense or crime originated [26] (factor 5); an officer's knowledge that he was without authority to make an arrest [27] (factor 6); "[an officer's] blatant disregard of state law and the chain of command[;]" (factor 7) [28]; the motivation behind the state statute limiting territorial jurisdiction and whether it was designed to protect against unreasonable police behavior [29] (factor 8); and the state's interest in making a particular type of

**23.** *See Abbott,* 30 F.3d at 998 (compliance with state law may be a factor in reasonableness determination) (citing *Baker,* 16 F.3d at 856 n. 1); *Mikulski,* 317 F.3d at 1232 (citation omitted); *Jones,* 428 F.Supp.2d at 503 ("[T]he fact that an arrest may have violated a territorial-limitation statute, whether it be state or federal, is merely a factor to be considered when deciding whether [the] constitutional mandate of [reasonableness] has been followed."); *Peach,* 327 F.Supp.2d at 1086 (citation omitted). *Cf. Sawyer,* 441 F.3d at 899 (state law relevant but not determinative of federal question whether search executed by officers acting beyond their jurisdiction violated defendant's constitutional rights). *Contrast Simon,* 368 F.Supp.2d at 75–76 (arrest under circumstances not prescribed by local law *per se* unreasonable).

**24.** *See Pasiewicz,* 270 F.3d at 526 n. 3; *Mikulski,* 317 F.3d at 1232 (citation omitted). While some courts have found this factor to be highly important to a reasonableness assessment, *see Simon,* 368 F.Supp.2d at 77–78 (Washington Metropolitan Area Transit police officers, whose authority was limited by geography and the "narrowly circumscribed role of transit police," were not interchangeable with metropolitan police officers), other courts have given it much less weight and found arrests to be reasonable. *See Jones,* 428 F.Supp.2d 497 (U.S. Park ranger from Cumberland Gap National Historical Park making arrest beyond park borders in Tennessee); Fox, 147 F.Supp.2d at 1008 (arrest by U.S. Park police officer about 200 yards outside of federal property). *Cf. Sawyer,* 441 F.3d 890 (consent obtained by Kansas police officers acting without authority in Oklahoma not invalidated).

**25.** *See Ross,* 905 F.2d at 1354; *Peach,* 327 F.Supp.2d at 1085 (finding that exigent circumstances existed to justify BIA officer's ex-

tra-jurisdictional activity of searching suspect's vehicle parked outside the boundaries of an Indian reservation).

**26.** *See Simon,* 368 F.Supp 2d 73 (traffic violation for which officer stopped defendant took place at stop sign which officer mistakenly believed was on transit authority property); *Fox,* 147 F.Supp.2d 1008; *Peach,* 327 F.Supp.2d 1081 (BIA officer joined chase of suspect while latter's car was still on BIA road).

**27.** *See Pasiewicz,* 270 F.3d at 527; *Jones,* 428 F.Supp.2d at 503 (no indication that arresting officer knew he lacked authority to make arrest) (citation omitted); *U.S. v. Parke,* 842 F.Supp. 281 (E.D.Mich.1994) (finding that deterrent of extra-jurisdictional exercise of authority not needed where officer reasonably believed he was acting within his jurisdiction). *Contra Ross,* 905 F.2d at 1354 (finding that an officer's subjective belief regarding the validity of an arrest under state law only applies to a qualified immunity defense).

**28.** *Pasiewicz,* 270 F.3d at 527 (finding that reasonableness of extra-jurisdictional arrest might be called into question if the local police department had specifically prohibited forest preserve officers from arresting appellant).

**29.** *Abbott,* 30 F.3d at 1000 (Arnold, C.J., dissenting) (listing various reasons why a state might want to circumscribe the jurisdiction of law enforcement officers including the fact that smaller communities may have limited funds to properly train officers in "the elements of probable cause and arrest procedures" and for the types of arrests likely to occur within their community). *See also Lopuszynski* at 1395–1398.

arrest (factor 9).[30]

A totality of the circumstances assessment of the case *sub judice* touches upon many of the above factors. Most of these factors weigh in favor of the reasonableness of the arrest. As to factor one, the most important factor—probable cause—the Court finds that Sgt. Jackson had

probable cause to arrest defendant for driving under the influence of alcohol *prior* to the administration of the FSTs. Sgt. Jackson testified to defendant's erratic driving, the smell of alcohol coming from defendant's person, his bloodshot eyes, and his slurred and incoherent speech. These elements together constitute probable cause for a DUI arrest.[31] Moreover, de-

**30.** *Stark v. New York State Dept. of Motor Vehicles,* 104 A.D.2d 194, 483 N.Y.S.2d 824 (N.Y.App.Div.1984) (using state's interest in precipitating a DUI arrest as part of determination of reasonableness under the Fourth Amendment). The Court recognizes that this case is of limited precedential value in the District of Maryland but notes that the Supreme Court, the Fourth Circuit, and Maryland state courts have underscored the societal and governmental interest in regulating drunk driving. *See, e.g., Michigan State Police v. Sitz,* 496 U.S. 444, 451, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) ("No one can seriously dispute the magnitude of the drunken driving problem or the states' interest in eradicating it."); *Reid,* 929 F.2d at 993–994 (stating that "[s]ociety has a recognized interest in protecting its citizens from drunk drivers," and observing that the Supreme Court has in this context upheld the forcible extraction of blood over defendant's objection, roadside sobriety check points, and admission of defendant's refusal to take a breathalyser test) (citations omitted); *Blasi,* 893 A.2d at 1166–1167 (citing *Rowe v. State,* 363 Md. 424, 769 A.2d 879, 889 (2001)).

**31.** *See* 1 *Drinking/Driving Litigation: Criminal and Civil* § 5:5 (2d ed. Sept.2006)(an officer may establish probable cause based on an erratic driving pattern or a driving offense accompanied by various symptoms of intoxication including poor performance on the field sobriety tests, an odor of alcohol on the driver's breath, unsteadiness, a flushed face, and bloodshot eyes) (citations omitted). The factors in the present case would be sufficient to support probable cause for either a citizen's arrest or an arrest by an officer properly within his territorial jurisdiction. *See* 1 *Drinking/Driving Litigation: Criminal and Civil* § 5:9 (2d ed. Sept.2006)("A number of factors can be relied upon in determining whether probable cause for a *citizen's arrest* exists: they include observation of erratic driving, odor of alcohol on defendant's

breath, staggering or unsteadiness, slurred speech, and bloodshot eyes. The presence of all these factors is not required for valid arrest.") (citations omitted and emphasis added). *See also Blasi v. State,* 167 Md.App. 483, 893 A.2d 1152 (Sp.App.2006) (concluding that the following factors constitute "more than reasonable articulable suspicion" of a DUI: erratic driving, a strong odor of alcohol emanating from vehicle and defendant, defendant's bloodshot and glassy eyes and slurred speech, and defendant's admission that he had consumed "just a few" drinks); *Brown v. Director of Revenue,* 85 S.W.3d 1, 4 (Mo.2002) (stating that the level of probable cause necessary to arrest a driver for an alcohol-related violation exists "when a police officer observes an unusual or illegal operation of a motor vehicle and observes indicia of intoxication upon coming into contact with the motorist") (citation omitted); *McCabe v. Director of Revenue,* 7 S.W.3d 12, 14 (Mo.App. 1999) (finding probable caused based on defendant's erratic driving, the odor of alcohol on his breath, and his refusal to submit to FSTs); *Niedzwiedz,* 205 Ill.Dec. 837, 644 N.E.2d at 54–55 (highlighting the following elements when finding arrest valid: officer's secondhand knowledge of defendant's erratic driving and actual witnessing of same; defendant's "slurred and thick-tongued" speaking manner, sluggish movements, fumbling for license, odor of alcohol, and admission of drinking). *Cf. State v. Batty,* 259 Ga.App. 431, 577 S.E.2d 98 (2003) (finding no probable cause to believe defendant was impaired when she made an illegal turn but did not weave, speed, or drive below the speed limit, she performed well on FSTs, and she exhibited no outward signs of impairment such as poor balance, slurred speech, or watery, bloodshot, or glassy eyes); *State v. Brown,* 725 So.2d 441 (Fla.Dist.Ct.App.1999) (noting that "[t]he odor of alcohol on a driver's breath is a critical (if not the only) factor in many cases involving admissibility of a blood

fendant's failure of the FSTs certainly provided Sgt. Jackson with the probable cause for a warrantless arrest under the Fourth Amendment. *See, e.g., Reid,* 929 F.2d at 994 (defendants lawfully arrested after they were observed driving in a suspicious manner, smelled of alcohol, and failed FSTs).[32]

Additionally, analysis of the facts under factors 4, 5, 6, 7, 8 and 9 weigh in favor of the reasonableness of the arrest. It is undisputed that the misdemeanor originated on Route 175, within the jurisdiction of Sgt. Jackson[33] (factor 5). Moreover, there is no evidence before the Court to indicate that the Sergeant intended to act outside of his territorial jurisdiction or that he was in blatant disregard of orders from his Fort Meade superiors or local law enforcement (factor 7). Indeed, similar to the situation in *Fox,* 147 F.Supp.2d 1008, when Sgt. Jackson first saw defendant commit a traffic violation and alerted defendant that he wished to pull him over, defendant was on Route 175, within the geographic scope of authority of Fort Meade military police. It is nothing more than a fluke that defendant did not pull over to the side of Route 175 but instead turned onto Mapes Road and into the Dunkin' Donuts parking lot. Importantly, Sgt. Jackson asked the Anne Arundel County police officer if he wanted to handle the arrest, but he declined. In light of the reluctance of the Anne Arundel County police officer to take over the case, unless he initiated the stop himself, Sgt. Jackson was faced with the dangerous prospect of having to allow an obviously intoxicated suspect to get back in his car and drive away. Such a situation presents exigent circumstances (factor 4).[34] Maryland's desire to curtail the practice of drunk driving within its borders is manifest and demonstrated by the severe penalties for alcohol related traffic violations.[35] (factor 9) All these factors speak to the reasonableness of the arrest at issue.

As to factor 2, it is undisputed that there is no statute affirmatively granting Sgt. Jackson the authority to make an arrest outside his jurisdiction, in Anne Arundel County. He was acting *ultra vires* but not in defiance of any specific statute aimed at

---

test under the statute.... Indeed, the *absence* of the odor of alcohol is critical in suppression cases.") (citations omitted, emphasis in original).

**32.** Based on hearing testimony, it is the Court's understanding that Sgt. Jackson not only has extensive experience as a traffic officer but has received specialized training to facilitate the exercise of his duties. This training includes preliminary breath test schools and military police school. Therefore, the Court finds that serious fears regarding training "in the elements of probable cause" expressed by Judge Arnold in *Abbott,* 30 F.3d at 1000 (Arnold, C.J, dissenting), would not be applicable here.

**33.** At the Court's request, the government submitted documentation demonstrating that Fort Meade and Anne Arundel County share concurrent jurisdiction of Route 175. The Court is satisfied that they do at the point on 175 where the defendant's conduct occurred.

**34.** Courts have viewed as mitigating if the law enforcement officer acting extra-territorially was simply from another political subdivision of the same state (factor 3). This, of course, is not the case here. So this factor does not indicate reasonableness; however, this factor is not a critical one in at least some courts' opinions. *See supra* n. 24.

**35.** A driver may receive up to one year's imprisonment and be assessed a fine of up to $1,000 as punishment for a first offense for driving while under the influence of alcohol. MD Code Ann. Transportation §§ 21–902(a) and 27–101. An arrest for a third such offense will triple the penalty. Id. Although the punishment is less severe, a judge may sentence a driver to up to two months in prison and assess a penalty of up to $500 for a first offense for driving while impaired by alcohol. MD Code Ann. Transportation §§ 21–902(b) and 27–101.

prohibiting exercise of arrest powers under these circumstances (factor 8). Sgt. Jackson readily admitted that he knew he was beyond his jurisdiction—some 75 feet—at the Dunkin Donuts where the defendant pulled over but not that he was without arrest authority (factor 5). Rather, he stated that it was "standard operating procedure" to pursue DUI suspects even beyond Fort Meade territorial jurisdiction. It is thus not clear that Sgt. Jackson knew that he lacked arrest authority. Only in response to the Court's request and only after the hearing did the government produce any written policy on extra-territorial authority of the military police. The Fort Meade Directorate of Emergency Services Operations Manual, Rules Governing Pursuits (41.2.2A) 5(b) provides that "Fort Meade pursuing a vehicle due to a misdemeanor should discontinue the pursuant at boundary the [sic] installation limits."[36] Also, Army Regulation 190-5, Section IV: Off Installation Traffic Activities 4-17 provides: "In areas not under military control, civil authorities enforce traffic laws." An informal "standard operating procedure" may have developed to pursue DUI suspects beyond the United States territorial jurisdiction. However, no legal authority for this "SOP" has been provided and it directly contradicts those governing Army regulations and operations manual provisions belatedly provided to the Court. Accordingly, the Court has found no legal basis for Sgt. Jackson's extra-territorial arrest, but the Army continues to prosecute the DUI, effectively endorsing Sgt. Jackson's actions, as appropriate and legally defensible. Given the Army's view, it is hard to conclude that Sgt. Jackson's *ultra vires* arrest was in "blatant disregard of ... [federal] law and the chain of command." (factor 6).

The Court appreciates that the State of Maryland has a strong "interest in monitoring law enforcement personnel within its boundaries," *see Sawyer*, 441 F.3d at 898, and that this interest may be especially pronounced in the case of military police officers enforcing civil law. *See Bissonette*, 776 F.2d 1384. However, the Court takes notice of the fact that Fort Meade military police routinely arrest Maryland drivers for traffic violations, including driving under the influence of alcohol, and as stated above, the state has a strong interest in the apprehension of drunk drivers. Finally, there seems to be acquiescence of Anne Arundel County (at least at the local level) in Sgt. Jackson's exercise of arrest powers extra-territorially. Sgt. Jackson testified that he asked the Anne Arundel County police officer present at the stop if he wanted to handle the arrest and he declined.[37] While Sgt. Jackson clearly lacked any affirmative arrest authority, Anne Arundel County appeared to tolerate, if not endorse, such extra-territorial action on the part of the military police.[38]

Given the strong governmental and societal interests in controlling dangerous

---

**36.** The government provided these rules as well as Army Regulation 190-5 in response to the Court's request for any internal regulations or procedures affecting law enforcement by military police beyond the boundaries of Fort Meade or within areas of concurrent jurisdiction. The government provided them post-hearing without comment.

**37.** Sgt. Jackson testified that on previous occasions, county police have refused to take control of an arrest when the behavior prompting a stop begins within the territory of Fort Meade and the stop is realized just outside of the base's jurisdiction. When faced with such a refusal, Sgt. Jackson stated that he takes care of the case himself.

**38.** The government reported in its most recent memorandum that there are no memoranda of understanding between Anne Arundel County law enforcement and the military police on traffic enforcement in these circumstances.

driving and apprehending drunk drivers and the other circumstances surrounding Sgt. Jackson's arrest of defendant discussed above, the Court holds that the extra-jurisdictional nature of the arrest and seizure in this case was not unreasonable under the Fourth Amendment. Nonetheless, by finding Sgt. Jackson's extra-jurisdictional arrest to be reasonable under these circumstances, this Court does not encourage nor condone a general failure to comply with the law or law enforcement procedures. *See Mikulski,* 317 F.3d at 1233; *Pasiewicz,* 270 F.3d at 525 (noting that forest preserve officers should have obtained a warrant prior to arresting appellant). Sgt. Jackson and other Fort Meade military police, not to mention Anne Arundel County law enforcement officers, must have a complete understanding of and respect for the geographical limitations of their authority. *See Simon,*

368 F.Supp.2d at 79 (finding that exclusion of evidence "serves the purpose of encouraging law enforcement officers to know the bounds of their authority"). Since the Court has now ruled that such arrests are *ultra vires,* the Fort Meade military police leadership should make sure that the military police are fully cognizant of the limits of their authority under federal and state law and indeed under their own manual and regulations and that appropriate agreements be considered with neighboring jurisdictions, such as Anne Arundel County, to safeguard the highways while respecting territorial limitations. This Court understands that "the Fourth Amendment demands reasonableness, not perfection[,]" *Pasiewicz,* 270 F.3d at 525, and as such, finds that Sgt. Jackson's extra-jurisdictional arrest of defendant did not amount to a constitutional violation under the specific facts presented.[39]

---

**39.** The Court notes that even if the extra-jurisdictional arrest of the defendant was found unreasonable under the Constitution, the exclusionary rule would not automatically apply. *Hudson v. Michigan,* —— U.S. ——, ——, 126 S.Ct. 2159, 2164, 165 L.Ed.2d 56 (whether the rule should be invoked in a particular case is separate from the issue of whether a party's Fourth Amendment rights were violated) (citations omitted); *Arizona v. Evans,* 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (citations omitted). The exclusionary rule is a remedy that should not be "appl[ied] lightly." *Sanchez–Llamas v. Oregon,* —— U.S. ——, ——, 126 S.Ct. 2669, 2680, 165 L.Ed.2d 557 (2006); *Hudson v. Michigan,* 126 S.Ct. at 2163 (noting that the suppression of evidence is a "last resort, not [a] first impulse"). Courts must bear in mind that the main purpose behind the rule is not the redress of any injury caused to the victim of an illegal search or seizure but the deterrence of future police misconduct. *See, e.g., Arizona,* 514 U.S. at 10–11, 115 S.Ct. 1185 (citations omitted); *U.S. v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (citations omitted). In keeping with that goal, application of the rule is reserved for those instances where its remedial objectives would be "most efficaciously served." *Hudson v. Michigan,*

126 S.Ct. at 2163 (quoting *U.S. v. Leon,* 468 U.S. 897, 908, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)). Moreover, the benefits gained from any deterrent effect must outweigh the social costs that result from placing an obstacle in the way of the "truth-finding goals of our judicial system." *Parke,* 842 F.Supp. at 287 (citing *Leon,* 468 U.S. at 906, 104 S.Ct. 3405). *See also Hudson v. Michigan,* 126 S.Ct. at 2163 (citations omitted).

The Court observes that where an officer effectuates an arrest under the belief that a lawbreaker will entirely escape the consequences of his actions if that arrest is not made, deterrence may be of little use, and the exclusionary rule may be an excessive remedy. *See Parke,* 842 F.Supp. at 287. Such a situation would be distinguishable from an instance of "severe official misconduct born of malice, caprice or brazen lawlessness," *U.S. v. Sanders,* 104 Fed.Appx. 916, 921 (4th Cir.2004) (unpublished) (quoting *U.S. v. Neiswender,* 590 F.2d 1269, 1271–72 (4th Cir. 1979)), or a case involving "evidence of widespread or repeated violations" where application of the rule might be appropriate. *Id.* (quoting *U.S. v. Walden,* 490 F.2d 372, 377 (4th Cir.1974)). However, the Court need not reach that question here, but this authority

### III. *Conclusion*

For the reasons discussed above, defendant's motion to suppress is DENIED.

provides a potentially strong alternative ground for the denial of the motion to suppress.