ROBERTS, J.,
Dissenting.
¶ 35. This case requires a close examination of the extent of a municipal law enforcement officer’s authority to pursue and arrest a citizen outside of his territorial jurisdiction without acting in hot pursuit for a violation that did not occur in that officer’s jurisdiction. I would conclude that, based on controlling precedent, a law enforcement officer possesses the same authority a private citizen possesses to make a citizen’s arrest. Because private citizens are not statutorily authorized to arrest other private citizens for violations of county ordinances when no breach of the peace occurs or is threatened, I would find that James Robert Delker’s arrest was unauthorized. Because evidence seized as a result of an unlawful arrest is not admissible, I would reverse Delker’s conviction and render a judgment of acquittal. Accordingly, I cannot concur with the majority’s decision to affirm the judgment of the circuit court. I respectfully dissent.
¶ 36. The underlying facts of this case are undisputed. Ben Langston, the Chief of Police for the Town of Marion, Mississippi, was on duty the night of Christmas Eve 2005.[6] At approximately 11:00 p.m., Chief Langston was in his patrol car at the entrance of the Valley Ridge Apartments on the south side of Old Country Club Road. Old Country Club Road runs east to west and was, therefore, perpendicular to Chief Langston’s position at the time. As long as Chief Langston remained in the apartment parking lot, he was in his jurisdiction. Old Country Club Road was not in Chief Langston’s jurisdiction, although he mistakenly believed that it was.[7]
¶ 37. As Chief Langston was on his way out of the parking lot, Delker drove his car east down Old Country Club Road. Chief Langston’s patrol car was not equipped with radar, but based on his training, Chief Langston believed that Delker was driving approximately forty-five miles per hour.[8] The posted speed limit on Old Country Club Road was thirty-five miles per hour. Chief Langston never saw Delker within the territorial jurisdictional boundaries of the Town of Marion. Chief Langston pulled onto the street, out of his jurisdiction, and pursued Delker. Chief Langston turned on his flashing lights, but Delker did not stop. Chief Langston used his radio to call dispatch to request assistance from the Lauderdale County Sheriffs Department.
¶ 38. Delker continued east on Old Country Club Road for a short distance. Chief Langston later testified that he “paced” Delker’s car and that, during the pursuit, Delker’s car reached speeds as high as approximately sixty-five miles per hour. Approximately 700 yards east of the entrance to the apartments, Old Country Club Road intersects with Lizelia Road. Delker did not stop at the one-way stop at *323 the Lizelia Road intersection. Instead, he went around a car stopped at the one-way stop sign, did not stop at all, and proceeded north on Lizelia Road. A short distance north of that intersection, Lizelia Road forks to the right. The left fork turns into Van Zyverden Road. Delker took the left fork onto Van Zyverden Road and continued driving a short distance until he turned left into the driveway of his home. The total distance from the apartment parking lot to Delker’s home is approximately eight-tenths of a mile.
¶ 39. Chief Langston followed Delker into his driveway. Chief Langston later testified that he smelled alcohol emanating from Delker’s car. Chief Langston had Delker get out of his car. Delker reportedly had trouble getting out of the car. Chief Langston testified that Delker also had some difficulty standing and that his speech was slurred. Chief Langston approached Delker and asked him why he did not stop. According to Chief Lang-ston, Delker replied, that he “knew he was going to go to jail, and he didn’t want to leave his car along side the roadway.” Chief Langston handcuffed Delker and placed him in custody in the back of his patrol car.
¶40. As previously mentioned, during the short pursuit, Chief Langston had radioed for assistance from the Lauderdale County Sheriffs Department. Approximately five minutes after Chief Langston first confronted Delker, Deputy Karey Williams arrived. According to Chief Langston’s testimony, when Deputy Williams arrived at Delker’s house, Delker was in the back seat of Chief Langston’s patrol car. However, Deputy Williams testified that Delker was handcuffed, but Delker was not in Chief Langston’s patrol car when he arrived at the scene. In any event, Deputy Williams transported Delker to the Lauderdale County Jail and administered a field sobriety test, aspects of which Delker reportedly failed. Deputy Williams asked Delker to blow into the Intoxilyzer 8000 machine. Delker declined to do so. On January 3, 2006, Deputy Williams formally charged Delker for felony driving under the influence of alcohol and driving with a suspended driver’s license. That same date, Chief Langston charged Delker with reckless driving. The evidence obtained due to Chief Langston’s stop and his arrest — as characterized by the circuit court — included: (1) a beer can found in Delker’s car; (2) a partially empty whiskey bottle also found in Delker’s car; (3) personal observations of Delker’s behavior, including swaying, compromised balance, slurred speech, and lack of fine motor control; (4) an odor of alcohol; (5) Delker’s refusal to take a portable breathalyzer test; (6) Delker’s field sobriety test; and (7) Delker’s refusal to blow into the Intoxilyzer 8000 machine.
¶ 41. Delker filed a pretrial motion in limine to suppress evidence seized as a result of Chief Langston’s stop. Delker argued that Chief Langston had no authority to stop or arrest him because he never committed any offense in Chief Langston’s jurisdiction. The circuit court found no merit to Delker’s argument. Instead, the circuit court found that Chief Langston acted as a private citizen and that Chief Langston had the authority to effectuate a citizen’s arrest under the circumstances. The circuit court’s decision was not based on the concept that Chief Langston acted in good faith.[9] Delker claims the circuit *324 court erred. The majority finds no merit to Delker’s argument. I respectfully disagree.
¶42. The Fourth Amendment to the United States Constitution and Article 3, Section 23 of the Mississippi Constitution provide that an individual has the right to be free from unreasonable searches and seizures. Dies v. State, 926 So.2d 910, 917-18(1121) (Miss.2006). Evidence, however relevant and trustworthy, obtained from an illegal arrest or detention is inadmissible at trial. Davis v. Mississippi, 394 U.S. 721, 724, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). “The exclusionary rule was fashioned as a sanction to redress and deter overreaching governmental conduct prohibited by the Fourth Amendment.” Id. The circuit court found that Chief Langston had the right to stop Delker from the moment he saw Delker speeding, and that Chief Langston actually effectuated Delker’s arrest. That is, the circuit court never found that Deputy Williams arrested Delker. The circuit court’s decision in that regard is not on appeal. Accordingly, any analysis on appeal must be from that perspective.
¶ 43. “Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a ‘seizure’ of ‘persons’ within the meaning of this provision.” Whren v. United States, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (citations omitted). The Mississippi Supreme Court has stated that it “is committed to the rule that an arrest begins when the pursuit to make the arrest begins.” Pollard v. State, 233 So.2d 792, 793 (Miss.1970). Furthermore:
If an officer does not have the authority to make an arrest at the instant he begins his pursuit for the purpose of making the arrest, the fact that the person the officer is pursuing violates the traffic law in making his escape does not thereby authorize the arrest that began unlawfully, because an officer who attempts an unlawful arrest cannot later arrest a citizen for resisting such trespass.
Id. (quoting Smith v. State, 240 Miss. 738, 744, 128 So.2d 857, 859-60 (1961)).
¶ 44. However, the circuit court found that Chief Langston could have only acted as a private citizen because Chief Lang-ston was out of his jurisdiction, and he was not in hot pursuit of Delker due to some violation that originally occurred in Chief Langston’s jurisdiction.[10] It is undisputed *325 that Delker was never in Chief Langston’s jurisdiction, so Chief Langston could not have been engaged in fresh pursuit of Delker for some violation that occurred within the Town of Marion.[11] During the hearing on Delker’s motion to suppress, Delker’s attorney played the videotape of events captured by Deputy Williams’s dashboard camera while Chief Langston and Deputy Williams were at Delker’s house on Christmas Eve 2005. Chief Langston testified that he was not able to hear a particular exchange that took place between himself and Deputy Williams. The following exchange then transpired between Chief Langston and Delker’s attorney:
[Delker’s attorney]. Didn’t [Deputy] Williams question you about why weren’t you handling this case, and you told him it was better for him to handle it because it was outside your jurisdiction?
[Chief Langston]. I don’t remember that. I couldn’t make it. It was close to time for me to go home. I don’t remember it.
[Delker’s attorney]. What I want you to be clear on, and so the record will properly reflect it, did you tell [Deputy Williams] that you — that it would be better for him to handle it because it was outside your jurisdiction, or you don’t recall making that statement?
[Chief Langston], I don’t recall telling him that.
[Delker’s attorney]. And again, for purposes of clarity, are you saying that you did not tell him that or you don’t recall saying that?
[Chief Langston]. I don’t remember telling him. I don’t remember telling him that.
Accordingly, Chief Langston did not deny that he told Deputy Williams that he was aware he was outside of his jurisdiction. Instead, Chief Langston testified that he could not remember whether he admitted to Deputy Williams that he was outside of his jurisdiction.
¶45. The State, in its brief, argues exclusively that Chief Langston’s pursuit, arrest, and seizure of Delker was justified as an arrest by a private citizen. The State took the same position during oral arguments before this Court. In fact, the State specifically stated that it was “beholden” to the circuit court’s resolution that Chief Langston acted with the authority of a private citizen. The circuit court never based its decision on the concept that *326 Chief Langston acted with the good-faith, but mistaken, belief of a law enforcement officer. The State does not now and has never taken the position that Chief Lang-ston’s actions were those of a law enforcement officer acting in good faith but with the mistaken belief that Old Country Club Road was within his territorial jurisdiction. It is just as well because the Mississippi Supreme Court has held that “[a]n officer who seeks to make an arrest without [a] warrant outside his territory must be treated as a private person. Of course, his action will be lawful if the circumstances are such as would authorize a private person to make the arrest.” Nash v. State, 207 So.2d 104, 106 (Miss.1968) (quoting 5 Am.Jur.2d Arrests § 50 (1962)).
¶ 46. The issue that arises is when may a private citizen make an arrest? The law in Mississippi is clear that “[pjrivate persons may ... make arrests.” Miss.Code Ann. § 99-3-1(1) (Rev.2007). Pursuant to Mississippi Code Annotated section 99-3-7(1) (Rev.2007), a private citizen may only arrest another citizen under the following circumstances:
for an indictable offense committed, or a breach of the peace threatened or attempted in his presence; or when a person has committed a felony, though not in his presence; or when a felony has been committed, and he has reasonable ground to suspect and believe the person proposed to be arrested to have committed it; or on a charge, made upon reasonable cause, of the commission of a felony by the party proposed to be arrested.
There was no breach of the peace. Chief Langston suspected that Delker was speeding on a road that was not within Chief Langston’s jurisdiction. “A ‘simple traffic violation’ does not constitute a breach of the peace.” Atwell, 470 F.Supp.2d at 565 (citing Horn v. City of Seat Pleasant, Md., 57 F.Supp.2d 219, 226 (D.Md.1999) (holding that an officer did not have authority to arrest someone for driving 75 mph in a 55 mph where the suspect was driving on a road that was outside the officer’s jurisdiction.)) When Chief Langston began to pursue Delker, no felony had been committed, and Chief Langston had no reason at that time to conclude that Delker was committing a felony. The only valid circumstance under which Chief Langston, then judged as a private citizen, could have arrested Delker is if Delker had committed an “indictable offense.”
¶ 47. “The word ‘indictable’ ... means such offenses as a grand jury may indict for, and does not include municipal ordinances.” Letow v. U.S. Fid. & Guar. Co., 120 Miss. 763, 768, 83 So. 81, 82 (1919). When Chief Langston first encountered Delker, Chief Langston suspected that Delker was speeding on a county road.[12] *327 Mississippi Code Annotated section 63-3-511 (Rev.2004) provides, in part, as follows:
Whenever local authorities, including boards of supervisors, within their respective jurisdictions, determine upon the basis of an engineering and traffic investigation that the speed permitted under this article [i.e., 55 miles per hour] on any ... county road ... is greater than is reasonable or safe under conditions found to exist upon such ... county road ..., such local authorities shall determine and declare by ordinance, a reasonable and safe speed limit....
Accordingly, violations of municipal or county ordinances are not indictable offenses. They are not violations “against the peace and dignity of the [s]tate.” Miss. Const, art. 6, § 169. It follows that, under the circumstances, Chief Langston, acting as a private citizen, could not have effectuated a lawful and valid citizen’s arrest of Delker.
¶ 48. Although Chief Langston testified that he did not intend to arrest Delker for speeding and that Deputy Williams actually arrested Delker, the circuit court found that Chief Langston had “the authority, as a private citizen, to effectuate the arrest of [Delker] for the misdemeanor offense of speeding.” The circuit court also found that “the arrest of [Delker] was proper.” The circuit court never found that Deputy Williams arrested Delker. Because Delker has not appealed those findings and the State has not cross-appealed, the circuit court’s findings in that regard are not at issue. There is factual support for the circuit court’s decision, as Chief Langston handcuffed Delker and confined Delker in the back of his patrol car, where Delker was not free to leave until a deputy could arrive. Additionally, as previously mentioned, “an arrest begins when the pursuit to make the arrest begins.” Pollard, 233 So.2d at 793.
¶ 49. Based on the foregoing analysis, I must conclude that Chief Langston, acting with only the authority of a private citizen, had no authority to stop Delker for speeding on a county road outside of his jurisdiction. Because Chief Langston’s initial purpose was impermissible, Delker’s subsequent traffic violations did not cure Chief Langston’s unlawful arrest. Accordingly, Delker was seized in violation of his right to be free from unreasonable seizures, and all the evidence obtained as a result of the unreasonable seizure is inadmissible, including Deputy Williams’s field sobriety test that led to Delker’s conviction. Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (holding “all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court”).
¶ 50. The majority states that the proper resolution of this case involves two “very relevant” matters: “the time of Delker’s arrest and the offense(s) that he had committed at that time.” The majority concludes that, despite the precedential dictates that an arrest begins when a law enforcement officer initiates a pursuit, Chief Langston only arrested Delker when Delker got out of his car. Respectfully, the majority does not cite any authority which would allow a private citizen to pursue and stop another private citizen for the purpose of issuing a warning. The majority does not suggest that a private citizen has the right to stop another private citizen for speeding or any other violations of county or municipal ordinances. Furthermore, neither this opinion nor the majority opinion cites any authority that stands for *328 the proposition that an otherwise impermissible pursuit by a private citizen becomes permissible when another private citizen refuses to stop for an otherwise illegal pursuit. Consequently, Chief Lang-ston, acting only with the authority of a private citizen, had no legal authority to attempt to stop Delker to issue a warning. Similarly, Chief Langston, acting only with the authority of a private citizen, could not justify his continued pursuit on Delker’s failure to stop. Further, the concept that Chief Langston’s initial pursuit of Delker somehow is validated based on Chief Langston’s subjective intent to only issue a warning to Delker must be rejected. As previously stated, the supreme court has held as follows:
If an officer does not have the authority to make an arrest at the instant he begins his pursuit for the purpose of making the arrest, the fact that the person the officer is pursuing violates the traffic law in making his escape does not thereby authorize the arrest that began unlawfully, because an officer who attempts an unlawful arrest cannot later arrest a citizen for resisting such trespass.
Pollard, 233 So.2d at 793.
¶ 51. The majority then addresses what it considers to be the second relevant matter. According to the majority, that matter involves “the offense(s) that [Delker] had committed at the time of his arrest.” The majority concludes that the answer is “clear” and “not debatable” that Delker “had committed the crime of felony DUI.” I respectfully disagree. Chief Langston had a previous encounter with Delker shortly before the events that transpired on December 24, 2005. Chief Langston testified that, on an unspecified date in November 2005, he had arrested and transported Delker to the Lauderdale County Jail “[t]o have him blow in the intoxilyzer for possible DUI.” Although Chief Langston suspected that Delker was driving under the influence, Delker blew into the intoxilyzer machine, and “he did not go over the limit.” When Delker’s attorney asked Chief Langston to clarify that Delker “wasn’t driving under the influence on that occasion,” Chief Langston responded, “[o]f alcohol, no, sir.” Apparently, Chief Langston believed that, on that previous occasion, Delker was under the influence of something other than alcohol. However, there was no evidence to support Chief Langston’s assumption. Be that as it may, Chief Langston testified unequivocally that on Christmas Eve 2005, he did not know that Delker was operating the car until Delker arrived at his home and got out of the car.[13] Chief Langston *329 never testified that, at the time he realized that it was Delker who had been driving the car, he knew Delker had been, within five years of that time, twice convicted of driving under the influence. Chief Lang-ston was, however, aware that Delker was driving without a driver’s license. Chief Langston stated that he turned Delker over to Deputy Williams for processing. There simply is no basis whatsoever in the record to find that, at the time Chief Lang-ston placed Delker in custody, he had probable cause and reasonable grounds to conclude that Delker had committed a felony DUI offense. It was only after Deputy Williams concluded that Delker, in fact, had two prior convictions for driving under the influence within five years of the Christmas Eve 2005 incident that Delker was charged with felony driving under the influence, and that occurred ten days later on January 3, 2006. Accordingly, while we who are afforded with hindsight now know that Delker was engaged in felony driving under the influence on December 24, 2005, and while they might have suspected that Delker was under the influence, neither Chief Langston nor Deputy Williams had the benefit of knowing that it was a felony offense at that time.
¶ 52. As previously mentioned, when Chief Langston contacted the Lauderdale County Sheriffs Department, he was not aware that Delker was driving under the influence. Additionally, he was not aware that Delker had two prior convictions for driving under the influence. Finally, he was not aware that Delker’s two prior convictions for driving under the influence occurred within five years of December 24, 2005. Just because Chief Langston-com-pletely outside of his jurisdiction — contacts the appropriate law enforcement agency responsible for that jurisdiction — he does not somehow gain authority he previously did not have by virtue of information that he did not know. The majority seems to conclude that the result, albeit illegal, justifies the means. The facts cannot be changed. When Chief Langston began his pursuit and made his arrest, he was acting in his capacity as a Marion police officer. He used his marked police cruiser, flashing lights, siren, uniform, handcuffs, law-enforcement radio, and other assets to effectuate the arrest. It is only his authority to use such tools outside his jurisdiction that is under analysis.
¶ 53. The majority interprets section 99-3-7(1) to mean that a private citizen may arrest another private citizen without any knowledge or even a reason to suspect that the arrested private citizen committed a felony or an indictable offense. In other words, the majority finds that it is not what a private citizen knows or suspects that justifies the arrest, but rather what the private citizen later discovers after the arrest. The Mississippi Supreme Court has interpreted the predecessor to the present statute differently. According to our supreme court, the predecessor to section 99-3-7(1), section 1227 of the 1930 Mississippi Code, which was worded identically to the present statute, “authorizes among other things a private person to arrest without a warrant a person who has committed a felony, though not in his presence. There must be probable cause however to believe that a felony has been committed, and that the person arrested is the guilty one.” Howell v. Viener, 179 Miss. 872, 879-80, 176 So. 731, 733 (1937). Presently, section 99-3-7(1) states that “in all cases of arrests without a warrant, the person making such arrest must inform the accused of the object and cause of the arrest, except when he is in the actual commission of the offense, or is arrested *330 on pursuit.” Chief Langston did not know that Delker was driving under the influence when he attempted to stop him. I cannot concur with a finding that an arrest is justified based solely on what the person making the arrest later discovers as the fruit of what would otherwise be an unlawful arrest. It bears considering that the majority’s interpretation could also be extended to law enforcement officers, because section 99-3-7(1) applies to “[a]n officer or private person.” That is, section 99-3-7(1) does not distinguish between a private citizen’s authority to make arrests as opposed to a law enforcement officer’s authority to make arrests.
¶ 54. Pursuant to the majority’s rationale, law enforcement agencies within a jurisdiction could simply call on non-jurisdictional agencies to do that which a jurisdictional agency could not do. . That is, assume sheriffs deputies in Hinds County, Mississippi wanted to obtain evidence or seize a person but it would be illegal to do so under the circumstances. According to the majority, those deputies would need only to contact officers with the Jackson Police Department to come outside the Jackson city limits to do that which the deputies could not, because pursuant to the majority’s rationale, those officers would be private citizens and their improper search or seizure would not be subject to the exclusionary rule.
¶ 55. Chief Langston does not “become” a private citizen because he attempted to stop Delker outside of his jurisdiction. As the Mississippi Supreme Court held in Nash, 207 So.2d at 106, “[a]n officer who seeks to make an arrest without warrant outside his territory must be treated as a private person.” Nash did not hold that the officer becomes a private citizen. Instead, the officer is merely treated as a private citizen. Nash made this imminently clear by stating that the actions of an officer who acts outside his jurisdiction “will be lawful if the circumstances are such as would authorize a private person to make the arrest.” Id. Rather, such an officer’s actions are legal if a private citizen could do what Chief Langston did. In the context of the application of the exclusionary rule, the natural extension of the relevant holding in Nash is that any evidence obtained by Chief Langston while acting outside of his jurisdiction is only admissible if a private citizen could have obtained that evidence. In other words, Chief Langston does not become exempt from the exclusionary rule just because he acts within the color of his office outside of his jurisdiction. Such a conclusion defies logic and, contrary to the Supreme Court’s decision in Mapp, removes all incentive for law enforcement agencies to conduct themselves within the boundaries of the constitutions.
¶ 56. Assuming for the sake of argument that Chief Langston somehow transformed from an on-duty police officer to a private citizen once he left the boundaries of his jurisdiction, under the circumstances of this case, the evidence he obtained is still subject to the exclusionary rule. “There is no question that ‘a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and such private wrongdoing does not deprive the government the right to use the evidence.’ ” United States v. Kirk, 392 F.Supp.2d 760, 764 (N.D.Miss.2005) (quoting United States v. Jenkins, 46 F.3d 447, 460 (5th Cir.1995)). “However, if a private citizen acts as a government agent or instrument, then that citizen violates the Fourth Amendment by engaging in an unlawful search.” Id. at 765 (citing United States v. Bazan, 807 F.2d 1200, 1202 (5th Cir.1986)).
¶ 57. There is a two-pronged test to determine whether a private citizen has *331 acted as a government agent in this context: “(1) whether the government knew of or acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement or to further his own ends.” Id. (citing United States v. Miller, 688 F.2d 652, 657 (9th Cir.1982)). “De minimis or incidental contacts between the citizen and law enforcement agents ... will not be subject to Fourth Amendment scrutiny.” Id. “The government must be an active participant or an encourager of the private citizen’s actions for the citizen to become an instrument of the state.” Id.
¶ 58. No exercise in semantics can characterize Chief Langston’s contact with Delker as “de minimis” or “incidental.” Chief Langston purposefully initiated an attempted traffic stop outside of his jurisdiction. When he did so, he intended to act within the authority of his office as a governmental law enforcement officer. He claims he mistakenly believed that he was inside his jurisdiction. In that sense, the government most certainly knew of Chief Langston’s conduct because Chief Lang-ston intended to act in his capacity as an agent of the government. Chief Langston never intended to act as a private citizen. He was on-duty. He was in his uniform and his patrol car. A municipal police officer’s “official uniform and weapon may be worn and utilized only at locations which are within the jurisdiction of the governmental entity whose uniform and weapon are involved.” Miss.Code Ann. § 17-25-11(5) (Supp.2008). Chief Lang-ston used his flashing blue lights to attempt to stop Delker. “Only police vehicles used for emergency work may be marked with blinking, oscillating or rotating blue lights to warn other vehicles to yield the right-of-way.” Miss.Code Ann. § 63-7-19(1) (Supp.2008). “It is unlawful for any person, other than a law enforcement officer on duty, to use or display blue lights on a motor vehicle.” Miss.Code Ann. § 63-7-20(1) (Rev.2004). Chief Langston used the radio provided to him by the government to request assistance from other government agents. In other words, Chief Langston used all the tools that were available to him as a law enforcement officer. Not only did Chief Langston intend to assist law enforcement — he intended to act as law enforcement. Accordingly, even if one concludes that Chief Langston transformed into a private citizen when he pulled out onto Old Country Club Road, pursuant to the two-pronged test to determine whether a person acted as a government agent, no reasonable person could conclude that Chief Langston was not a government agent. Consequently, any evidence he obtained is subject to the exclusionary rule-which would apply to not just the Marion Police Department, but also the Lauderdale County Sheriffs Department. See e.g., Atwell, 470 F.Supp.2d at 567 (citing State v. Phoenix, 428 So.2d 262, 266 (Fl.Dist.Ct.App.1982) (holding that a police officer acting outside of his or her jurisdiction may not utilize the power of his office to gather evidence not otherwise obtainable)).
¶ 59. It is necessary to elaborate on what is termed the “good-faith” exception to the exclusionary rule. First and foremost, the majority cites no authority by which the good-faith exception to the exclusionary rule applies to private citizens. In any event, the United States Supreme Court discussed the good-faith exception to the exclusionary rule in Arizona v. Evans, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). Jurisdiction was not a question in that case. Rather, a police officer observed a defendant driving the wrong way down a one-way street. Id. at 4, 115 S.Ct. 1185. The officer stopped the defendant and asked to see his driver’s license. Id. The defendant informed the *332 officer that his driver’s license had been suspended. Id. As a consequence, the officer entered the defendant’s name into a computer located in the officer’s patrol car. Id. The computer inquiry indicated that there was an outstanding warrant for the defendant’s arrest. Id. The officer arrested the defendant who, while being handcuffed, dropped a marijuana cigarette. Id. When officers searched the defendant’s car, they found a bag of marijuana under one of the defendant’s car seats. Id. It was later determined that the warrant for the defendant’s arrest had been quashed seventeen days before the officer arrested the defendant. Id. The defendant sought to suppress the evidence seized as a result of the officer’s arrest. Id. The Supreme Court held that the good-faith exception to the exclusionary rule applied. According to the Supreme Court, “[w]here the officer’s conduct is objectively reasonable, excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that ... the officer is acting as a reasonable officer would and should act in similar circumstances.” Id. at 11-12, 115 S.Ct. 1185 (citation and internal quotations omitted). “Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty.” Id. at 12, 115 S.Ct. 1185. The Supreme Court went on to hold that there was “no basis for believing that application of the exclusionary rule in these circumstances will have a significant effect on court employees responsible for informing the police that a warrant has been quashed.” Id. at 15, 115 S.Ct. 1185. There is absolutely no evidence that a reasonable officer would be unaware of his jurisdictional boundaries, or that he would stop and arrest individuals for offenses that occurred outside of his jurisdiction. There was no evidence that Chief Langston received erroneous advice from anyone as to the location of the boundaries of his jurisdiction. In fact, Chief Langston never explained the source of his mistaken belief as to the limits of his jurisdiction. It appears that he simply assumed, without any articulable basis, that Old Country Club Road was within his jurisdiction. As previously mentioned, the only evidence of any inquiry regarding whether Old Country Club Road was within Chief Langston’s jurisdiction occurred shortly before the hearing on Delker’s motion to suppress, when-upon Chief Lang-ston’s inquiry-a country road crew correctly informed the Marion Chief of Police that Old Country Club Road was not within his jurisdiction. In this case, excluding the evidence at issue would not make Chief Langston less willing to perform his duties. Instead, applying the exclusionary rule would encourage him to be aware of the boundaries of his jurisdiction and make him less likely to undertake non-jurisdictional stops or arrests of individuals who did not commit an offense within his jurisdiction.
¶ 60. We have previously affirmed a trial court if the trial court reached the right result for the wrong reason. See Towner v. State, 887 So.2d 221, 225(¶ 9) (Miss.Ct.App.2003). In my opinion, we cannot do so in this case for two reasons. First and foremost, the circuit court did not find as a fact that Chief Langston had a good-faith-but-mistaken belief that Delker was within Chief Langston’s jurisdiction when Chief Langston encountered Delker. Neither the district attorney at trial, the circuit court, nor the attorney general relied on that argument. To make that argument for the State in this instance would require that this Court act as an advocate, rather than an impartial arbiter of disputes. Second, such a conclusion by us would constitute fact-finding, and our mandate requires that we can only review a *333 trial court’s factual findings because we are not fact-finders.
¶ 61. Recently, the Mississippi Supreme Court reversed this Court in our determination that a post-conviction-relief petitioner was entitled to an evidentiary hearing on his claim of constitutionally deficient trial counsel. Moore v. State, 986 So.2d 928, 937(¶ 30) (Miss.2008). The petitioner claimed that a law enforcement officer stopped him solely because the petitioner’s vehicle had just one working tail light. Id. at 929(¶ 2). Later research of the motor vehicle statutes reflected that, pursuant to Mississippi law, only one working tail light is required. Miss.Code Ann. § 63-7-13 (Rev.2004). The Mississippi Supreme Court stated, “[f]rom the totality of the record before us, we conclude that [the officer] had an objective, reasonable basis for believing that [Frederick] Moore was in violation of the law for driving a vehicle on a public street with only one operative tail light.” Id. at 935(¶21). In other words, the supreme court held that the officer’s objective belief that the petitioner had committed a traffic violation sufficed as justification for the officer’s traffic stop.
¶ 62. In this case, the evidence revealed that an approximate one-mile section of the southern right-of-way of Old Country Club Road served as the entire northern boundary of the Town of Marion. Chief Langston, a fourteen-year seasoned law enforcement veteran, had been patrolling within the Town of Marion for more than eight years. As previously discussed, there is absolutely no evidence that: (1) a reasonable officer would be unaware of his jurisdictional boundaries; (2) a reasonable officer would stop and arrest individuals for offenses that occurred outside of his jurisdiction; or (3) Chief Langston received erroneous advice from anyone as to the location of the boundaries of his jurisdiction. Chief Langston never explained the source of his mistaken belief as to the limits of his jurisdiction. The record supports just one conclusion — Chief Langston merely assumed, without any articulable basis, that Old Country Club Road was within his jurisdiction. Chief Langston’s assumption may well have been objectively unreasonable and less than candid.
¶ 63. “[T]he purpose of the exclusionary rule ‘is to deter-to compel respect for the constitutional guaranty in the only effectively available way-by removing the incentive to disregard it.’” Mapp, 367 U.S. at 656, 81 S.Ct. 1684 (quoting Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)). Prior to the United States Supreme Court’s decision in Mapp, only federal prosecutors were subject to the exclusionary rule, while it was left to each state to determine whether its prosecutors were likewise subject to the exclusionary rule. Id. at 657, 81 S.Ct. 1684 (“Presently, a federal prosecutor may make no use of evidence illegally seized, but a State’s attorney across the street may, although he supposedly is operating under the enforceable prohibitions of the same Amendment.”). The Supreme Court noted that “[i]n non-exelusionary States, federal officers, being human, were by it invited to and did, as our cases indicate, step across the street to the State’s attorney with their unconstitutionally seized evidence.” Id. at 658, 81 S.Ct. 1684. However, the Supreme Court held that the exclusionary rule applied to each state, regardless whether that state had adopted the exclusionary rule on its own. Id. at 655, 81 S.Ct. 1684. The same rationale applies to the concurrent jurisdiction that the Lauderdale County Sheriffs Department has along with the Marion Police Department. To hold that one law enforcement agency may use evidence that another law enforcement agency is prohibited from using would be contrary to the Supreme Court’s decision in Mapp, and it *334 would eviscerate the purpose of the exclusionary rule — to deter the incentive to ignore constitutional guarantees. The main purpose of the exclusionary rule is to deter future police misconduct. Evans, 514 U.S. at 10, 115 S.Ct. 1185. Exclusion of evidence under the circumstances “serves the purpose of encouraging law enforcement officers to know the bounds of their authority.” United States v. Simon, 368 F.Supp.2d 73, 79 (D.D.C.2005).
¶ 64. In Mapp, the United States Supreme Court addressed the concern that some criminals would go free due to errors by law enforcement officers. Mapp, 367 U.S. at 659, 81 S.Ct. 1684. The Supreme Court concluded that “[i]n some cases this will undoubtedly be the result.” Id. However, the Supreme Court recognized that “there is another consideration-the imperative of judicial integrity.” Id. (quoting Elkins, 364 U.S. at 222, 80 S.Ct. 1437). The Supreme Court went on to state as follows:
The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence.... Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.
Id. (internal quotations and citations omitted). In its wisdom, the Supreme Court recognized that its decision in Mapp “gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice.” Id. at 660, 81 S.Ct. 1684.
¶ 65. The Double Jeopardy Clause of the United States Constitution precludes a second trial when an appellate court has found the evidence against a defendant to be legally insufficient. Burks v. United States, 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). “[T]he only ‘just’ remedy available is ... the direction of a judgment of acquittal.” Id. Having found that the evidence obtained from Delker should have been suppressed, I must conclude that there is no remaining incriminating evidence sufficient to support a conviction of Delker. A complete lack of evidence is undoubtedly insufficient evidence. Consequently, I would find that it is inappropriate to reverse and remand for a new trial. “[T]he prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble.” Id. at 16, 98 S.Ct. 2141. The Mississippi Supreme Court has directed that when, as a result of the suppression of evidence obtained illegally, the evidence against the accused cannot sustain a conviction, the proper remedy is to reverse and render. White v. State, 735 So.2d 221, 224 (¶¶ 10-11) (Miss.1999). I would follow the direction of the Mississippi Supreme Court, reverse Delker’s conviction, render a judgment of acquittal, and order Delker discharged.
KING, C.J., GRIFFIS AND ISHEE, JJ„ JOIN THIS OPINION. BARNES, J., JOINS THIS OPINION IN PART.

. The Town of Marion is a small incorporated municipality located adjacent to the City of Meridian in Lauderdale County, Mississippi. According to the 2000 federal census, Marion had a population of 1,305 residents.

. Old Country Club Road (the rights of way on each side as well as the pavement itself) is in Lauderdale County, but it is not within the Town of Marion. Consequently, the Lauder-dale County Sheriffs Department is responsible for enforcing the law on Old Country Club Road.

. Because Marion does not have more than 2,000 residents, its small police department was not authorized to use radar speed detection equipment. Miss.Code Ann. § 63-3-519(1) (Rev.2004).

. It is possible that the circuit court did not resolve the issue based on a good-faith analysis because to do so would carry the possibility that, had the circuit court declined to be-Heve that Chief Langston acted in good faith, it would be necessary to consider whether Chief Langston committed perjury when he *324 said he believed he was within his territorial jurisdiction.

. The record reflects that, as of the date of the hearing on Delker's motion to suppress, Chief Langston had been a law enforcement officer for approximately fourteen years. In July 1997, Chief Langston began working for the Marion Police Department. In July 2005, Chief Langston began working in his capacity as the chief of police. I can think of no municipal employee more chargeable with knowledge of the actual location of his municipal boundaries than the chief of police. However, Chief Langston testified that the first knowledge he had of the exact location of the northern boundary of the Town of Marion was two or three weeks before Delker’s trial when he talked with members of a Lauderdale County road maintenance crew who were working on Old Country Club Road. That road maintenance crew informed Chief Langston that Old Country Club Road was not within the municipal boundaries of Marion. Photographs of the two signs announcing entry into the northernmost Marion municipal boundary were introduced into evidence. Both of those signs are south of Old Country Club Road. The circuit court took judicial notice that, pursuant to the decree establishing the boundaries of the Town of Marion, "the south right-of-way line of ... [Old] Country Club Road, was the northeastern boundary line of the Town of Marion.” Delker’s attorney also submitted the affidavit of Terrell Temple, "the Lauderdale County *325 consulting civil engineer,” who stated that Old Country Club Road was outside of the municipal boundaries of the Town of Marion. Accordingly, it is entirely undisputed that Delker was never within Chief Langston’s jurisdiction. Regardless of whether Chief Langston’s claim of ignorance of the location of the Marion municipal boundaries was reasonable, the circuit court never found that Chief Langston had a good-faith but erroneous belief that Delker was within Chief Lang-ston's jurisdiction when Chief Langston encountered Delker.

. In United States v. Atwell, 470 F.Supp.2d 554 (D.Md.2007), the Maryland United States District Court reviewed the lawfulness of an arrest by a military police (MP) officer for violations that occurred within the MP's jurisdiction while the actual stop and arrest occurred outside the MP's jurisdiction. The Maryland District Court found that the MP’s stop and arrest were lawful, in part, because a traffic offense occurred within the MP’s jurisdiction. Id. at 571. The Maryland District Court when on to hold that it was reasonable for the MP to stop the defendant in Atwell because the MP "formed his reasonable articulable suspicion while both he and the defendant were within the [MP’s] zone of authority.” Id. at 572. That is not what occurred in this case. Delker was never within Chief Langston’s jurisdiction on the night of Christmas Eve 2005. He most certainly never committed a violation of any law within Chief Langston's jurisdiction.

. Delker argues that the posted speed limit of thirty-five miles per hour was not established in the manner mandated by law. In the post-trial proceedings before the circuit court, Delker attempted to present evidence that, on January 10, 1975, the Lauderdale County Board of Supervisors had originally established a default speed limit of fifty-five miles per hour on all county roads unless the Board determined, on the basis of a commissioned engineering and traffic study, that a lower speed limit was necessary. Delker also attempted to demonstrate that, on October 7, 1996, the Board had adopted an amended order, without referencing an engineering and traffic study, that changed die default speed limit from fifty-five miles per hour to forty miles per hour. Assuming without finding that the modified default speed limit meets the requirements of Mississippi law, there appears to be no engineering and traffic study or even an order by which the Board modified the speed limit on Old Country Club Road to thirty-five miles per hour. It appears that the thirty-five miles per hour posted speed limit on Old Country Club Road was set randomly and without an order by the Board. *327 However, my opinion does not turn on whether Delker was actually speeding, but whether Chief Langston’s stop violated Delker's constitutional rights.

. On December 24, 2005, Delker was driving a red Mercury four-door car. The record reflects that, on December 8, 2005, Delker was stopped while driving the same car bearing the same license plate number. Neither the prosecution nor the defense asked Chief Langston what Delker was driving when Chief Langston stopped Delker in November 2005. Likewise, neither the prosecution nor the defense asked Chief Langston whether he ran the license plate of Delker’s car prior to realizing that Delker was driving, or if he did not run the license plate of the car, why he did not request that information. The record also reflects that Chief Langston issued a citation to Delker charging him with driving without a driver’s license during the November incident. One might be inclined to conclude that, when Chief Langston saw Delker’s red Mercury car on the night of Christmas Eve, Chief Langston may have determined that Delker needed to be stopped again to check the status of his driver's license. However, such a conclusion must be based on speculation because Chief Langston testified, under oath, that he did not know who was driving the small red Mercury car when he began his pursuit. Otherwise, there is no testimony to contradict Chief Langston's claim that he did not know who was driving the car. I am disinclined to compare Chief Langston with Sergeant Schultz of fame from *329 the television series "Hogan’s Heroes" who often claimed, "I know nothing — nothing!"